868 P.2d 437

**Raymond Joseph TOUGAS, Plaintiff–Appellant/Cross–Appellee,**

v.

**Carol TOUGAS, Defendant–Appellee/Cross–Appellant.**

**No. 16429.**

Supreme Court of Hawai'i.

Feb. 7, 1994.

20

Peter Van Name Esser, Honolulu, for plaintiff-appellant/cross-appellee Raymond Joseph Tougas.

Daniel S. Ukishima, Honolulu, for defendant-appellee/cross-appellant Carol Tougas.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

Appellant/Cross–Appellee Raymond Joseph Tougas (Husband) and Appellee/Cross–Appellant Carol Tougas (Wife) appeal the family court's distribution of the couples' marital assets pursuant to Hawai'i Revised Statutes (HRS) § 580–47 (Supp.1992). Hus-

band contends that the family court erred: 1) in abiding by the California court's ruling, which Husband alleges was in direct conflict with the Hawai'i court's prior decision as to the applicability of Wife's California partnership property to the divorce proceedings; 2) when it utilized Uniform Starting Points (USPs) in contravention of *Gussin v. Gussin*, 73 Haw. 470, 836 P.2d 484 (1992); and 3) by failing to credit him with various separate property contributions made prior to the marriage.

On cross appeal, Wife asserts that the family court erred: 1) when it refused to give full faith and credit to the California judgment, which she alleges prohibited the Hawai'i family court from considering her California partnership assets in the divorce action; and 2) by failing to divide the joint business in an equitable manner.

We find that the family court did not abuse its discretion and thereby affirm the court's final division and distribution of the Tougases' marital estate.

## I. *BACKGROUND*

Husband was born on July 18, 1947, and Wife was born on October 13, 1945. They met in 1969 while working and traveling in the Orient. After two years of long distance correspondence both relocated to Hawai'i and began living together.

Before moving in with Wife, Husband attended a three-month commercial diving school in California, which provided training in underwater burning and welding, underwater oil exploration, salvage work, underwater photography, and survey work. Subsequently, Husband obtained work as a part-time diver and in 1973 secured a position at Isle Dive, a Hawai'i diving company of which he later became the manager. Wife, meanwhile, attended the University of Hawai'i, pursuing a bachelor's degree in public health administration while working part-time as a waitress. Wife also periodically received trust fund payments from her parents who resided in California. Husband and Wife pooled their limited resources to pay for rent, transportation, food, gas and other living expenses.

After receiving her bachelor's degree, Wife continued her education, earning a master's degree in public health administration in 1974. Although she was one of two finalists for a public health administrative position with Hawai'i Medical Service Association (HMSA), upon request by Husband, she withdrew her application with HMSA to work with Husband at Isle Dive.

Not long after Wife began working with Husband, he encouraged Wife to leave Isle Dive to form a diving company of their own, Pacific Diving Industries, Inc. (PDI), which performed maintenance and repair services to vessels and also underwater demolition work. Wife was instrumental in incorporating PDI, and she took the initiative to contact clients, set up business bank accounts, and obtain office space. She also created and ran the operating systems, including the accounting system, used by PDI. Essentially, Wife was in charge of the administrative end of the business while Husband conducted the dives.

Over the next ten years, the business flourished due to Wife's management and Husband's underwater maintenance and repair skills. By 1985, PDI averaged nearly a half million dollars in gross receipts each year.

Prior to marriage, but during the period in which the couple was co-habitating and pooling their resources, Husband made a number of investments. In October 1978 and March 1979, Husband bought condominiums at Lani–Loa on Mott–Smith Street in Honolulu and at Windward Harbor in Kailua. In 1979, the parties bought a house on Puamamane Street in Niu Valley in which they resided for six years.

After approximately five years of living together, Wife and Husband were married on September 1, 1979. In May 1980, the couple had a daughter.[1] Wife continued to work in her administrative capacities for PDI but on

---

1. Custody and visitation issues were resolved by stipulation in a California custody proceeding in 1987, and were not before the court in the April 1992 divorce trial. The Tougases share legal and physical custody of their daughter, with Wife serving as the primary caregiver.

a part-time basis, conducting most of the work at home.

In May 1981, the couple sold the Puamamane home for $200,000.00, which was turned over to purchase a residence on Lumahai Street for $991,152.00, of which $87,000.00 remained due at the time of trial. Husband and Wife also bought three pieces of property in California, the Olive and Lindfield Street investments, from wife's father, Calvin Bright. The Tougases further invested in Calvin Bright's real estate company, forming an interest-bearing account called "Valley Sales."

In November 1985, Wife and Husband separated. Wife and daughter moved out of the Lumahai Street home to an apartment in the Lani–Loa building on Mott–Smith Street. Wife continued to carry on the administrative duties at PDI, even after she and her daughter moved to California in 1986, until she was terminated at the end of the year.

Wife's parents, Calvin and Marjorie Bright (Brights), reside in California and have acquired a large estate from their investments in real estate, construction, and land development. In 1976, the Brights, in an effort to produce an estate plan to provide exclusively for their three children, created a partnership with their children called the CLS partnership. The Brights were to contribute all of the assets to the partnership, but the children would have no control over these assets, and all decisions relating to the partnership were to be made by the Brights. Further, the income from the partnership was to be reinvested, not distributed to the children during their working years, and the children could not make withdrawals from the partnership for their personal needs.

The Brights conditioned the creation of this partnership on the understanding that it would benefit the Bright children to the exclusion of their spouses or significant others. As such, the partnership would not be formed unless all parties, including Wife, her siblings, and the respective spouses and significant others agreed to sign an accompanying "spousal consent" form stating the above-mentioned purpose as well as consent forms acknowledging that the spouses and Husband[2] were to have no interest in the proceeds of the CLS partnership.

Although encouraged to take the document to an attorney to make sure they understood its contents and consequences, Husband and the other spouses chose not to consult with legal counsel and each of them signed the "spousal consent" form in relation to the CLS partnership, relinquishing all right, title and interest in the Bright children's partnership interests, property, income, expenses and liabilities. The "spousal consent" form also included Husband's and the other spouses' acknowledgment of the CLS partnership as separate property, inaccessible during a divorce action.

The Brights did not disclose, prior to the creation and signing of the "spousal consent" forms, the value of the partnership assets. In fact, even Wife and her siblings were not aware of the extent of the assets or debts of the partnership, other than that they included real property encumbered by debts. Wife and her siblings did not receive monies from the partnership but were required to report the partnership interest as an asset on their income tax returns. Such disclosure, however, was at no cost to Wife and her siblings in that the Brights provided the monies to pay the taxes as well as the fees for tax preparation.

In 1983, the Brights formed a second partnership called Stonebridge in which the Brights were the general partners and their children the limited partners. No "spousal consent" forms were signed in regard to this subsequent partnership. However, as with the CLS partnership, Wife was not involved in its management and Husband was made aware, after an attempt to invest in both the CLS and Stonebridge partnerships, that, like the CLS partnership, the Brights intended to limit the proceeds from the Stonebridge partnership to benefit only the Bright children.

---

**2.** At the time the partnership was formed, Husband and Wife were living together but were not married.

On January 15, 1987, Husband filed a complaint for divorce in the Family Court of the First Circuit, State of Hawai'i, against Wife. Prior to the divorce trial, Husband sought to compel discovery of all documents and information relating to the financial status of Wife's partnership interests in California— the CLS and Stonebridge partnerships.

On September 15, 1988, district family court Judge Evelyn Lance granted Husband's motion to compel discovery as to the value of the CLS and Stonebridge partnerships. The court concluded that Wife had failed to establish that disclosure of the information about the partnerships would so severely prejudice Wife's family members as to outweigh the relevance of such information in the divorce proceedings. The court further explained that the "spousal consent" agreement was not covered by Hawai'i's Uniform Pre–Marital Agreement Act (HRS ch. 572D), inasmuch as it was entered into prior to July 1, 1987.[3] The agreement, therefore, would be enforceable if valid as a contract. The enforceability of the "spousal consent" agreement, however, was governed by the law of California because California had the most significant relationship to the partnership agreement. The court thereby ordered Wife to produce documentation as to the value of CLS and Stonebridge assets at various points in time unless Carol could provide proof that California law would not require such disclosure under the circumstances.

On November 28, 1988, the court issued an Order Re: Pending Motions whereby it: 1) denied Wife's motion for reconsideration; 2) denied Husband's motion for further hearing; 3) set for further hearing Wife's motion to compel discovery; and 4) set for further hearing Husband's motion seeking relief pursuant to Hawai'i Family Court Rule 37. Because Wife had not provided proof that California law recognized the spousal consent agreement, the court also required Wife to disclose the nature and extent of her separate property as of certain dates significant to the divorce proceedings.

Judge Lance further specified that the "spousal consent" agreement did not constitute a binding "Marriage Settlement" within the meaning of Section 5133 of the California Civil Code. The judge determined that the agreement was not executed in compliance with the formal requirements established pursuant to California law for the following reasons: 1) at the time of the execution of the agreement, there was no meeting of the minds; 2) Husband did not receive consideration for the execution of the agreement; 3) Wife did not provide Husband with any disclosure as to the nature and extent of her separate property before, during, or after the execution of the agreement; and 4) Husband did not waive disclosure by Wife of the nature and extent of the property.

In response to Judge Lance's order compelling Wife to disclose the nature and extent of her interests in the CLS and Stonebridge partnerships, the Brights filed an action in the Stanislaus County Superior Court in California seeking an order to protect the confidentiality of the partnership agreements they had set up solely to benefit their natural children. The Brights sought an order specifying that Husband had no interest in the CLS and Stonebridge partnerships and would be enjoined from seeking financial information about these partnerships.

In consideration of the pending California action, California Superior Court Judge Edward Lacy issued a temporary restraining order, followed by a preliminary injunction, barring Husband and Wife from obtaining information relating to the CLS and Stonebridge partnerships despite the Hawai'i order compelling such discovery.

At the hearing held on January 17, 1989, Wife asked the Hawai'i family court to set aside its discovery orders based on the intervening decision by the California Superior Court. Judge Lance denied Wife's request and instead fined Wife $10,000.00 for defying the discovery rulings, and "enjoin[ed Wife] from taking any action in any other court

---

3. HRS § 572D–10 (Supp.1992), entitled "Prior agreements," provides:

All written agreements entered into prior to July 1, 1987, between prospective spouses for the purpose of affecting any of the provisions of this chapter shall be valid and enforceable if otherwise valid as contracts.

who's [sic] primary purpose is to avoid compliance with orders entered in this court[.]"[4]

In a judgment entered on August 10, 1989, the California Superior Court directly responded to Judge Lance's rulings by recognizing the fact of the conflicting orders emanating from the Hawai'i and California courts. Judge Lacy then determined that, while the spousal consent was not a premarital agreement under California law, it was, nevertheless, a valid contract. The court concluded that, in accordance with this contract, Husband gave up any interest, claim, or benefit from Wife's interest in the CLS and Stonebridge partnerships and any property interest conveyed by the Brights to Wife. Specifically, Husband was not to benefit, now or in the future, by way of set off or otherwise relating to child support, spousal support, or division and distribution of property and debts in the Hawai'i divorce action. The California court further ordered that Husband was permanently enjoined and restrained from seeking any financial data or other information pertaining to the CLS or Stonebridge partnerships.

Husband returned to Hawai'i and again asked the family court to compel discovery of the partnership information. After a hearing conducted on August 10, 1989, Judge Michael Town rejected Husband's request and ordered the California Superior Court's judgment to be given "full faith and credit" and that "it shall be the law of the case."

Meanwhile, Husband appealed the California Superior Court's judgment to the California Court of Appeal. On May 8, 1991, the California appellate court affirmed the trial court's conclusions, reversing only that part of the judgment proscribing the release of financial information regarding the Bright family's partnership interests. The California Court of Appeal reasoned that because there was no evidence in the record that the parties had an agreement regarding confidentiality or the effect thereon of a dissolution of marriage, and because the information alone had no property value subject to protection under the "spousal consent" agreement, the release of information concerning CLS or any other partnership or partnership asset belonging to Wife could not be enjoined. Thus, the appellate court concluded that the "spousal consent" agreement could not be interpreted as a waiver by Husband of the right to acquire *information* about the partnerships for purposes of support in a later divorce action.

Although the Hawai'i hearing over which Judge Town presided was held on August 10, 1989, the order memorializing his decision was not filed until April 13, 1992, after the California Court of Appeal had affirmed in part and reversed in part the California Superior Court's decision.

Thereafter, Judge Linda Luke of the Family Court of the First Circuit, State of Hawai'i, issued a Supplemental Order which remedied this discrepancy. Judge Luke reaffirmed Judge Town's ruling but concluded that the Hawai'i court would still be able to consider Wife's separate property holdings in *assessing* the condition that the parties would be left in following the divorce. Also, Judge Luke declared that Wife's separate property partnership interests would be relevant in determining an appropriate child support award and whether or not alimony was awardable.[5]

Following trial, the family court, Judge Luke presiding, issued the following relevant decrees: (1) Husband must pay $1,360.00 per month in child support; (2) the marital residence on Lumahai Street was divided equally between Wife and Husband; (3) Husband was awarded one hundred percent of PDI's premarital value ($170,974.00) and seventy-five percent of PDI's post-marital value ($453,394.50), and Wife was awarded twenty-five percent of PDI's post-marital value ($151,131.50); and (4) Husband was not entitled to any share of Wife's interest in the two partnerships.

Both Husband's and Wife's timely appeals followed.

---

4. Wife has not appealed the trial court's order to pay sanctions, and thus that matter is not before us on appeal.

5. Wife's separate property holdings were estimated to be worth approximately $14,000,000.00.

**26**

## II. *DISCUSSION*

### A. *Discretion Conferred By HRS § 580–47*

"We review the family court's final division and distribution of the estate of the parties under the abuse of discretion standard,[6] in view of the factors set forth in HRS § 580–47 and partnership principles." *Gussin v. Gussin,* 73 Haw. 470, 486, 836 P.2d 484, 492 (1992).

In *Gussin,* this court emphasized the wide discretion conferred upon the family court by HRS § 580–47 (Supp.1992).[7] Quoting *Myers v. Myers,* 70 Haw. 143, 148–49, 764 P.2d 1237, 1241 (1988), we expanded upon the above maxim:

> "[t]here is . . . no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in HRS § 580–47." *Au Hoy v. Au Hoy,* 60 Haw. 354, 357, 590 P.2d 80, 82 (1979). Section 580–47 "gives to the family court the discretion to divide marital property according to what is just and equitable[,]" *Cassiday v. Cassiday,* 68 Haw. 383, 388, 716 P.2d 1133, 1137 (1986) (citation omitted). . . .
>
> When the directive to the court is to do what is just and equitable in the circumstances, "[o]f course, each case must be decided upon its own facts and circumstances." *Carson v. Carson,* 50 Haw. 182, 183, 436 P.2d 7, 9 (1967). This "do[es] not mean that the . . . court may do whatever pleases it. [A grant of discretion] means instead that the court has a range of choice, and that its decision will not be

disturbed as long as it stays within that range and is not influenced by any mistake of law." *Kern v. TXO Prod. Corp.,* 738 F.2d 968, 970 (8th Cir.1984).

In *Gussin,* the court further articulated:

> "[d]iscretion" denotes the absence of a hard and fast rule. [Citation omitted.] When involved as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.

*Gussin,* 73 Haw. at 479, 836 P.2d at 489 (citations omitted).

With this broad brush of discretion, we have "avoided, where possible, the adoption of general rules governing the division of marital assets," because such general rules create rebuttable presumptions that narrow the discretion of family court judges and are thus repugnant to HRS § 580–47. *Gussin,* 73 Haw. at 480, 836 P.2d at 489 (1992) (citations omitted).

According to the Intermediate Court of Appeals (ICA), USPs are not " "fixed rules for determining the amount of property to be awarded to each spouse in a divorce action" [but are points] from which to commence equitable distribution analysis and application of statutory and case law mandates." *Hashimoto v. Hashimoto,* 6 Haw.App. 424, 426, 725 P.2d 520, 522 (1986) (citing *Cassiday v. Cassiday,* 68 Haw. 383, 716 P.2d 1133 (1986)). The ICA reasoned that USPs "pre-

---

6. Under the abuse of discretion standard of review, the appellate court is not authorized to disturb the family court's decision unless (1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason. Except in those rare situations where the appellate court can conclude, as a matter of law, that the family court had only one choice, its only authorized courses of action are to affirm or to vacate and remand. *Bennett v. Bennett,* 8 Haw.App. 415, 416, 807 P.2d 597, 599 (1991).

7. HRS § 580–47 (Supp.1992) provides in relevant part:

(a) Upon granting a divorce . . . the court may make such further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate. . . . In making such further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.

clude the use of non-uniform starting points," *Malek v. Malek*, 7 Haw.App. 377, 381, 768 P.2d 243, 247 (1989), and the family court " 'must start at the applicable USPs and then ... exercise its discretion[.]' " *Bennett*, 8 Haw.App. at 424, 807 P.2d at 602.

This, however, is not the case. Striking down the USPs, we concluded in *Gussin* that they *are* rebuttable presumptions that "bind a judge to automatically presume specific percentage splits in the division of each category of property." *Gussin*, 73 Haw. at 482, 836 P.2d at 490. Consequently, USPs violate the purpose of HRS § 580–47 because they unduly restrict the family court's discretion in determining the equitable division and distribution of the marital estate. *Id.* at 486, 836 P.2d at 492.

Despite the inapplicability of the USPs, the family court is not without any direction in determining the equitable division and distribution of marital estates in that the family court can still utilize the construct of five categories of net market values (NMVs) in divorce cases:

> Category 1. The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].
>
> Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
>
> Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

*Malek v. Malek*, 7 Haw.App. 377, 380–81 n. 1, 768 P.2d 243, 246–47 n. 1 (1989).

> The NMVs in Categories 1 and 3 are the parties' capital contributions to the marital partnership. The NMVs in Categories 2 and 4 are the during-the-marriage increase in the NMVs of the Categories 1 and 3 properties owned at DOCOEPOT. Category 5 is the DOCOEPOT NMV in excess of the Categories 1, 2, 3, and 4 NMVs. In other words, Category 5 is the net profit or loss of the marital partnership after deducting the partners' capital contributions and the during-the-marriage increase in the NMV of property that was a capital contribution to the partnership and is still owned at DOCOEPOT.

*Gardner v. Gardner*, 8 Haw.App. 461, 467, 810 P.2d 239, 240 (1991).

■ Armed with these general classifications, the family court is further guided in divorce proceedings by partnership principles in governing division and distribution:

> Under general partnership law, "each partner is entitled to be repaid his contributions to the partnership property, whether made by way of capital or advances." 59A Am.Jur.2d *Partnership* § 476 (1987) (footnotes omitted). Absent a legally permissible and binding partnership agreement to the contrary, "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted). Hawaii partnership law provides in relevant part as follows:
>
> **Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:
>
> (a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership

property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

*Gardner v. Gardner*, 8 Haw.App. 461, 464–65, 810 P.2d 239, 242 (1991) (quoting HRS § 425–118(a) (1985)). Therefore, if there is no agreement between the husband and wife defining the respective property interests, partnership principles dictate an equal division of the marital estate "where the only facts proved are the marriage itself and the existence of jointly owned property." *Gussin*, 73 Haw. at 484, 836 P.2d at 491 (quoting *Hashimoto*, 6 Haw.App. at 427 n. 4, 725 P.2d at 522 n. 4 (1986)).

■ Accordingly, while the family court judges are accorded wide discretion pursuant to HRS § 580–47 in adjudicating the rights of parties to a divorce, the family court strives for "a certain degree of 'uniformity, stability, clarity or predictability' [in its decision-making and thus] are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result." *Gussin*, 73 Haw. at 486, 836 P.2d at 492. The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings.

### B. *Full Faith and Credit Clause*

■ Before reviewing whether the family court abused its discretion in the division of the Tougases' marital properties, we must clarify the status of Wife's separate property holdings in relation to the divorce proceedings. Both parties claim that there was a full faith and credit violation, thereby affecting the classification of Wife's separate properties.

"[V]alid judgments of another state are entitled to full faith and credit in this jurisdiction." *Cobb v. Willis*, 7 Haw.App. 238, 242, 752 P.2d 106, 109 (1988) (citation omit-

ted); *see also Vaughan v. Williamson*, 1 Haw.App. 496, 621 P.2d 387 (1980).

■ A judgment is valid if:

1. the court rendering it had jurisdiction to act judicially in the case;
2. the party against whom the judgment is sought to be invoked had reasonable notice of the litigation and was afforded a reasonable opportunity to be heard;
3. it was rendered by a competent court; and
4. it is in compliance with the rendering state's requirements for the valid exercise of its court's powers.

*Cobb*, 7 Haw.App. at 242, 752 P.2d at 109 (citing *Restatement (Second) Conflict of Laws* § 92 (1971)).

Husband alleges that Judge Lance's ruling and Judge Lacy's subsequent decision conflicted, and therefore Judges Town and Luke were obligated, pursuant to the full faith and credit clause, to follow Judge Lance's earlier decision. Wife counters by averring that Judge Lacy's opinion simply did not conflict with Judge Lance's initial ruling.

In her first Order Granting Motion to Compel Discovery, Judge Lance recognized that California law controlled the determination of the validity of the spousal consent agreement, specifically stating that "the enforceability of [the spousal consent to the CLS partnership agreement] is governed by the law of California as California has the most significant relationship to the partnership agreement." Judge Lance even "presume[d] that Defendant's [Wife's] interests in the two partnerships would be her separate property under California marital dissolution community property statutory regime." Further, Judge Lance afforded Wife the opportunity to provide proof that California law would not require disclosure under the present factual circumstances, in regards to the enforceability of the spousal consent agreement. Thus, the fact that the California court later determined that the spousal consent was a valid contract is not contrary to Judge Lance's position as to the controlling law.

Despite the fact that she had already determined that California, not Hawai'i, law

was controlling, Judge Lance proceeded in the same order to discuss the spousal consent agreement under Hawai'i law. Judge Lance reasoned that "the waiver contained in the "spousal consent" would be a valid pre-marital contract if voluntarily entered into *with a knowledge of the financial situation of the prospective spouse,* and if not unconscionable at the time entered into." (Emphasis in original). Because Judge Lance had already established that no disclosure of the value of either partnership's assets was made prior to the signing of the consent form or at any time thereafter, this reasoning purports to conclusively determine the invalidity of the spousal consent agreement. However, Judge Lance was only postulating "if Hawai'i law were to apply." Inasmuch as she had determined that California law governed the enforceability of the pre-marital contract, the statements regarding the spousal consent under Hawai'i law were not contrary to the later California ruling.

However, in her subsequent order of November 28, 1988, Judge Lance independently interpreted California law and concluded that the spousal consent did "not constitute a binding Marriage Settlement within the meaning of Section 5133 of the California Civil Code." She then proceeded to list the formal requirements that were absent in the spousal consent agreement.[8] California Superior Court Judge Lacy's subsequent issuance of a temporary restraining order, a preliminary injunction, and a Statement of the Case barring the discovery of documentation in relation to the partnerships obviously conflicted with Judge Lance's order compelling discovery of that very information.

When Judge Town set aside Judge Lance's order to compel discovery, affording full faith and credit to Judge Lacy's final decision, the Hawai'i family court, according to Husband,

violated the full faith and credit clause pursuant to the following rationale:

> [T]he full faith and credit clause of the federal Constitution does not require a state to give recognition to a judgment of a sister state in opposition to an earlier judgment of its own courts.

50 C.J.S., "Judgments," Section 889 at 482; 47 Am.Jur.2d, "Judgments," Section 1251 at 248–49.

After the California Court of Appeal reversed the California Superior Court on the issue of discovery, Judge Luke afforded full faith and credit to the revised California ruling, allowed the release of information relating to Wife's partnerships, and determined that the partnership information could be considered in calculating child and spousal support and when viewing the condition in which each party would be left following the divorce. Judge Lance effectively pursued the same course in her first order when she stated:

> Defendant's [Wife's] income and net worth [including the partnerships] are relevant to establishment of alimony and of child support, and the extent of her separate property and the income-producing capacity of that property ... is part of the condition in which each party will be left by the divorce....

Order Granting Motion To Compel Discovery, dated September 15, 1988.

Therefore, despite the *initial* conflict between the California and Hawai'i discovery orders, the end result—that Wife must disclose information about the partnerships for consideration in the divorce proceedings—accorded proper full faith and credit to the *final* California order regarding the discoverability of the relevant partnership information. As such, the conflict between Judge Town's ruling and Judge Lance's prior decision amounted to harmless error.[9]

---

**8.** Judge Lance ruled that the requirements for a binding marriage settlement under California law include the following: (1) meeting of the minds at the time of the execution of the documents, (2) consideration for the execution of the documents, (3) disclosure, or a waiver of that disclosure, as to the nature and extent of the separate property at the time of the execution of the documents, or at any time thereafter. Order Re: Pending Motions, November 28, 1988.

**9.** Husband contends that Judge Lance not only declared that Wife must produce the partnerships' financial information but that the spousal consent at issue was not a valid marital settlement. While this statement is true, it does not have any bearing on the outcome of this case in that the California court determined that although the spousal consent was not a valid marital settlement, it was nonetheless a valid contract and therefore enforceable.

As noted, Wife also claims a violation of the full faith and credit clause. She argues that the Hawai'i courts did not afford Judge Lacy's decision full faith and credit when it considered the separate assets in the divorce case, purportedly in contradiction to the California courts' rulings. Wife's argument assumes that the final outcome of the litigation in the California courts was a prohibition barring Husband's access to the information. This is simply not the case.

The California appellate court determined that because the information was "being sought in order to apprise the Hawaiian trial court of the extent and value of the separate property holdings in a dissolution action involving support[,]" it was not a property interest that would be protected under the spousal consent agreement. The court further recognized that under both Hawai'i and California law, the information was required because it concerned separate property holdings that were relevant to a determination of alimony claims. Thus, the California appellate court reversed that part of Judge Lacy's judgment proscribing the release of financial information regarding the Bright family partnership assets.

By allowing access to the partnerships' financial documents and acknowledging the relevance of such information in divorce proceedings, the California appellate court anticipated that this information would be considered by the Hawai'i court. Thus, Wife's contention that the "evidence of her interest in the California partnerships was irrelevant and inadmissible at the Tougases' divorce trial by virtue of the California judgment" is in itself contrary to the final California judgment in that the appellate court's decision did not merely allow access to the information but acknowledged that such information was relevant to the just and equitable division and distribution of the marital estate.

In summary, while the Hawai'i and California court rulings did conflict at one point in the divorce proceedings, the end result was that Judge Luke required and utilized the documentation relating to the financial condition of the CLS and Stonebridge partnerships in the divorce proceeding just as Judge Lance and the California appellate court had ordered. At trial, therefore, the previous conflict was of no consequence. Accordingly, Wife's separate property holdings were legitimately considered by the trial court in determining the division of the Tougases' marital estate.

### C. Just and Equitable Distribution

#### 1. USPs

■ Husband alleges that Judge Luke improperly used and relied upon USPs in the distribution of the marital estate, despite Judge Luke's statement that she had not done so.

In the instant case, Judge Luke made a number of references to USPs in calculating the distribution of the Tougases' marital estate. However, after the trial had concluded but before she entered her decision, the *Gussin* case was decided, and Judge Luke was able to reconsider her distribution without the constraints of the USPs. It is true that Judge Luke's final calculations approximated the result that would have been generated by the USPs. However, application of the percentages contained in the USPs is not precluded by *Gussin*. *Gussin* prohibits mandatory, nondiscretionary application of these percentages upon characterizing particular pieces of property. Judge Luke unequivocally denied such an automatic application in her Findings of Fact and Conclusions of Law:

This Court has not utilized uniform starting points in its distribution of the estate of the parties, and has specifically deleted any columns entitled "USP Award" and "USP Percentage" from the Court's Charts 1 and 2 pursuant to *Gussin*.... [T]he references to categories which appear throughout the court's charts ... are not "Muraoka" [10] categories.... [and the categories] are simply the means by which this court is distinguishing property acquired during the marriage from property

10. In *Muraoka v. Muraoka*, 7 Haw.App. 432, 438, 776 P.2d 418, 422 (1989), the ICA specifically mandated that the family court list "how ...

[categories of marital property] would be divided and distributed to the parties under the applicable USPs."

brought into the marriage. This Court deems this to be a relevant distinction for purposes of property division as contemplated by HRS § 580–47 as to the respective merits of the parties, among other factors mandated by law.

In *Gussin*, this court vacated that portion of a divorce decree relating to a specific division of marital property to which the family court had applied a USP. Unlike the present case, the family court in *Gussin* stated that it had been limited to a USP with regard to a particular piece of property. This court held that the family court "clearly erred" in placing a limit on the potential award by applying the USP.

Here, because the family court ultimately acknowledged *Gussin* and sanitized its final order of any reliance on the USPs, it did not "clearly err" in referring to USPs prior to its subsequent recognition of the new law announced in *Gussin*. It therefore follows that the family court did not disregard any applicable rules or principles of law and did not improperly rely on USPs.

### 2. *Pre–Marital Separate Assets*

■ Husband also alleges that he is entitled to pre-marital separate property assets which he did not receive. Specifically, Husband contends that the following were his separate property: (1) PDI, comprised of the profit sharing plans and its appraised business value; (2) two bank accounts; (3) a securities account; (4) the equity in the Puamamane street residence; and (5) the equity in the Windward Harbor unit.

As to PDI, Judge Luke determined, after considering all of the relevant facts, that PDI was a joint business and not Husband's separate asset. Keeping in mind that "there is no fixed rule for determining the amount of property being awarded each spouse in a divorce action other than as set forth in the HRS § 580–47[,]" *Gussin*, 73 Haw. at 479, 836 P.2d at 489 (citation omitted), and that "[s]ection 580–47 gives to the family court the discretion to divide marital property according to what is just and equitable," *id.* (citation omitted), Judge Luke then divided the interests in PDI between Wife and Husband, allotting a larger portion of the profit

sharing plan to Wife but providing Husband with a significantly larger share of the business.

Husband contends that even if he were to concede that PDI was in fact a joint business, he was not credited with his separate property contributions to PDI and further, Wife was not entitled to a larger percentage of PDI's profit-sharing plans. Despite determining that the business was a joint enterprise, Judge Luke awarded twenty-five and not fifty percent of PDI to Wife. In deviating from the otherwise appropriate equal division, the judge took into consideration Husband's separate property contribution and Wife's separate CLS and Stonebridge partnership interests, which would leave Wife in a comparatively better economic condition than Husband after the divorce. Judge Luke further balanced the distribution by awarding Wife a slightly larger percentage of the PDI profit sharing plans. Considering the broad discretion accorded by HRS § 580–47, the court's thought process in effecting a just and equitable division of the Tougases' marital estate involved no error.

■ Judge Luke accounted for the other relevant marital assets as follows:

> [T]his court in respect to the category 1 credits that are being claimed by [Husband] did not consider and give him credit on this pre-marital net worth since I believe that from the time of co-habitation or living together that preceded the date of marriage that there was little of the pre-relationship net worth that should have been credited to [Husband].

July 31, 1992 Tr. at 38.

■ Separate property may become marital property if the spouse holding the separate property "gifts" it to the other spouse or to the marital estate. *Gussin*, 73 Haw. at 487–89, 836 P.2d at 493. To constitute a gift, however, there must be: (1) donative intent; (2) delivery; and (3) acceptance. *Bennett*, 8 Haw.App. at 425, 807 P.2d at 603. In *Gussin*, failure by the family court to make any finding as to donative intent or any other element bearing on whether a legal gift had been made constituted grounds to remand the decision.

■ In the present case, the family court did not specify whether Husband had made a gift of his separate assets that were not credited to him, thereby giving rise to an appearance of a *Gussin* violation. However, as discussed above, the family court is accorded broad discretion in deciding what is just and equitable under the circumstances. Judge Luke, in response to the subsequent motion for reconsideration, clearly articulated the reasoning underlying the exclusion of those particular assets in her order of distribution. And because the family courts are not bound by any "fixed rule for determining the amount of property being awarded each spouse," the court may, subject to the parameters of HRS § 580–47, exercise its own independent judgment in arriving at a just and equitable result. *Gussin,* 73 Haw. at 479, 836 P.2d at 489. Inasmuch as Judge Luke has not abused the broad discretion afforded by HRS § 580–47, we uphold her division of the Tougases' marital property.

### 3. *Deviation From Equal Division of Joint Business*

■ Finally, Wife argues that because the court determined that both she and Husband contributed as equal partners to the formation and operation of PDI, she should be allotted fifty percent, and not twenty-five percent, of the business.

■ The analysis of this contention is very much the same as that utilized above. Again, the court's actions in distributing the estate are discretionary, based on what the court deems to be just and equitable under the circumstances. Moreover, because the applicable statute, HRS § 580–47, allows the court to consider the condition of the parties after the divorce, separate property holdings may properly factor into the court's consideration. This does not mean, however, that Wife's partnership interests should offset Husband's interest in the marital estate. The validation of the spousal consent agreement, which operates as a waiver by Husband of all rights to the partnerships, conclusively establishes the contrary. The court may, nevertheless, alter alimony, child support and, as in this case, the ultimate distribution of the marital estate based on the respective separate conditions of the spouses.

We therefore hold that Judge Luke's deviation from the equal division of the Tougases' joint property is justified in light of Wife's significant separate property holdings.

### III. *CONCLUSION*

Accordingly, we affirm the family court's division and distribution of the Tougases' marital property.