**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000043
09-OCT-2024
07:47 AM
Dkt. 450 AMSDO**

NO. CAAP-20-0000043

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

SAMANTHA JANE KASNETZ, ALSO KNOWN AS SAMANTHA JANE WALASH,
SAMANTHA WALASH, SAMANTHA KASNETZ, AND S.J. KASNETZ WALASH,
SPECIAL ADMINISTRATOR OF THE ESTATE OF HERBERT R. KASNETZ, ALSO
KNOWN AS HERBERT ROY KASNETZ, DECEASED, Plaintiff-Appellant,
v.
DEBORAH A. KASNETZ, Defendant-Appellee

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(CASE NO. 1DV161000656)

**AMENDED[1] SUMMARY DISPOSITION ORDER**
(By: Hiraoka, Presiding Judge, Wadsworth and Guidry, JJ.)

Plaintiff-Appellant Herbert R. Kasnetz (**Husband**)

appeals from the Post-Divorce Judgment Regarding Reserved Issues

(**Judgment**) entered by the Family Court of the First Circuit

(**family court**) on January 16, 2020, as well as the Court's

---

[1]     We amend our July 23, 2024 Summary Disposition Order pursuant to the Order granting reconsideration filed contemporaneously with this Amended Summary Disposition Order.

Findings of Fact and Conclusions of Law (**FOF/COL**) entered by the family court on November 1, 2019.[2]

On appeal, Husband raises four points of error, contending: (1) that the family court abused its discretion in rejecting Husband's expert witness's computations, pertaining to the valuation of his Category 1 interests, in favor of an alternate method; (2) that the family court erred when it *sua sponte* awarded Defendant-Appellee Deborah A. Kasnetz (**Wife**) a $1.89 million Wells Fargo Individual Retirement Account (**IRA**) that was previously awarded to Husband in the property division, and computed Wife's equalization payment based on a property division chart that reflected the IRA as still awarded to Husband; (3) that the family court abused its discretion in awarding Wife $10,200 a month in spousal support for the duration of Husband's lifetime; and (4) that the family court abused its discretion in awarding Wife $450,000 in attorney's fees and costs.

Upon careful review of the record and relevant legal authorities, and giving due consideration to the issues raised and the arguments advanced by the parties, we resolve Husband's points of error as follows:

---

[2]     The Honorable Catherine H. Remigio entered the Judgment, and the FOF/COL.

2

(1) Husband contends that the family court erred in its valuation of Husband's Category 1[3] interests, by improperly valuing his Brookhollow National Bank shares. Husband acquired these bank shares prior to his marriage to Wife, and sold them during the marriage in 2002. At trial, Husband's expert witness, Charles Wilhoite (**Wilhoite**), testified that the value of Husband's interest in the bank shares at the time of his marriage, in 1990, was $9,730,000. Calculation of that valuation relied upon the sale price of the bank shares in 2002. Wife's witness, John Richard Candon, III (**Candon**), testified that Wilhoite's valuation methodology was flawed in its reliance on subsequent events, i.e., the sale of the bank shares in 2002.

The family court made the following relevant findings of fact (**FOF**),[4] with regard to the valuation of Husband's bank

---

[3] "Category 1" refers to one of the five partnership model categories.

> The partnership model distinguishes between marital partnership property that is brought into the marriage and marital partnership property that is acquired during the marriage. Accordingly, Hawaiʻi courts assign values to marital partnership property using five categories designed to assist courts in determining the equitable division and distribution of property between spouses[.]

Gordon v. Gordon, 135 Hawaiʻi 340, 349, 350 P.3d 1008, 1017 (2015) (cleaned up). Category 1 "includes the net market value of property separately owned by a spouse on the date of marriage[.]" Id.

[4] Of the following FOF, Husband challenges FOF 31, 36-38, 40-41, 53, 69, 75-77, and 79-80. We find that these facts are not clearly erroneous. The remaining FOF are unchallenged, and are therefore binding on this court. Okada Trucking Co. v. Bd. of Water Supply, 97 Hawaiʻi 450, 458,

(continued . . .)

shares at the time of his marriage to Wife in 1990, which we review under the "clearly erroneous" standard. <u>Fisher v. Fisher</u>, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006).

> 23. [Husband] claimed his net worth at the time of his marriage to [Wife] on June 22, 1990 (his Category 1 value) was $13,129,740.00. This claim is largely based on the value [Husband] places on his Brookhollow Bancshares, Inc. (BBI) and Brookhollow National Bank (BNB) interests. These assets are collectively referred to as the "Brookhollow interests".
>
> . . . .
>
> 31. [Husband] and [his first wife] clearly reached an agreement [the January 1990 Agreement Incident to Divorce (**AITD**)] that the Brookhollow National Bank stock had a fair market value of $13.125 ($10.50 x 1.25) a share at or near the time of their divorce [in 1990].
>
> . . . .
>
> 35. According to [Husband's] Statement of Financial Condition as of December 31, 1990, the estimated current value of [Husband's] 115,936 shares of Brookhollow Bancshares, Inc. stock was $1,595,279.00 ($13.76 a share) and the estimated current value of his 3,790 shares of Brookhollow National Bank, Inc. stock was $63,520.00 ($16.76 a share), for a total of $1,658,799.00. According to that Statement, his net worth was $5,178,301.00 as of December 31, 1990.
>
> 36. In compiling the Statements, Ms. [Lila] Husband[5] testified that it was not her goal to reflect fair market value, and she had no (personal) knowledge of the fair market value of the BBI and BNB assets. Ms. Husband testified the "estimated current value" of the assets contained in Exhibit V were "in all cases confirmed or estimated by others." She confirmed her notes of her discussion with Dan Bennett [the President of Brookhollow Bancshares, Inc. and Board Secretary and Executive Vice-President of Brookhollow National Bank] had "fmv" (meaning fair market value) and "a number." She apparently simply repeated Mr. Bennett's calculation or opinion in her Statements of Financial Condition.

---

4(. . .continued)
40 P.3d 73, 81 (2002) ("Findings of fact . . . that are not challenged on appeal are binding on the appellate court.").

5    Lila Husband (**Ms. Husband**) was Husband's certified public accountant in Texas.

37. When questioned specifically about the BNB estimated current value, Ms. Husband confirmed that the estimate was more than, or <u>better than book value</u>, and that she used a multiplier of 1.25 as directed by Dan Bennett.

38. When questioned specifically about the BBI estimated current value, Ms. Husband confirms the multiplier used was 1 (according to Dan Bennett) and confirmed that was Mr. Bennett's opinion of the <u>fair market value</u> of BBI.

39. The parties stipulated that [Husband] gave untruthful testimony to the Court about his Statements of Financial Condition in a prior proceeding. At that prior proceeding, [Husband] claimed he had no involvement in the preparation of these Statements. This turned out to be materially incorrect.

40. [Husband] testified at trial that he had reviewed the Statements of Financial Condition at the time they were prepared for him, but that he "paid no attention to them". [Husband's] testimony was <u>not credible</u> in this regard.

41. In addition, [Husband] did not deny paying <u>$10.50</u> a share (book value) to acquire additional Brookhollow National Bank shares the month immediately following his divorce from [his first wife] (i.e. March, 1990) and the month immediately preceding his marriage to [Wife] (i.e. May, 1990).

. . . .

44. On the date of his marriage to [Wife], [Husband] owned 3,790 shares of BNB common stock and 115,936 shares of BBI common stock.

45. During the marriage, between 1997 and 2000, [Husband] purchased 500 additional shares of BNB.

46. During the marriage, [Husband] purchased 5,750 additional shares of BBI as follows: 1,750 shares in 1992; 1,000 shares in 1994; and 3,000 shares between 1997 and 2002.

47. As of 2002, [Husband] owned 4,290 shares in BNB, and 121,686 shares in BBI.

48. On April 2, 2002, BNB and BBI were acquired by Regions Financial Corporation for approximately <u>$26.6</u> million, or <u>$132.49</u> per share.

49. [Husband] received <u>$16,969,414</u> for his 121,686 shares in BBI and <u>$251,866</u> for his 4,290 shares in BNB.

5

50. In September 2016, [Husband] hired Wilhoite Managements Associates to complete a valuation analysis of 3,790 shares of BNB common stock and 115,936 shares of BBI common stock, owned by [Husband] as of June 22, 1990 (the "Valuation Date").

51. Charles Wilhoite, CPA testified as an expert business evaluator.

52. The best evidence of fair market value is the price paid after arms-length negotiation between unrelated parties.

53. The definition of fair market value is generally based on information that was known or knowable as of the valuation date.

54. Absent a negotiated transaction, Mr. Wilhoite testified that experts generally look at 3-5 years of financial operating results for periods leading up to the Valuation Date. In this case, he could only find information for year-end 2002. There were no financial statements available to Mr. Wilhoite prior to 1992.

55. Despite the limits on information, Mr. Wilhoite determined he could evaluate the Brookhollow Assets by following the Statements on Standards for Valuation Services ("SSVS") requiring him [to] take certain steps, including to disclose limitations and develop a credible method of valuation.

. . . .

61. Mr. Wilhoite testified that, absent a negotiated transaction at or prior to the valuation date, it is reasonable to rely on valuations by people who are reasonably informed and knowledgeable about both the business and valuation. Mr. Wilhoite believed he was a person whose knowledge, training and experience qualify him to make such a valuation.

62. Acknowledging the limitation of information that was known or knowable as of the valuation date, Mr. Wilhoite based his evaluation on a market approach with three (3) identified methods given weighted values: The Transaction Approach of $16.6 mil. at 60% weight; the Guideline Publicly Traded Company Method of $13.4 mil. at 35% weight; and the Purchase Offers Method of $24.9 mil. at 5% weight.

63. Using this selected market approach, Mr. Wilhoite developed what he considered a reasonable estimate of the fair market value of the BNB and BBI (100%) as of June 22, 1990 at $15.9 mil.

6

64. While there were intervening events between 1990 and 2002, Mr. Wilhoite concluded that since the subject bank consistently performed during the same period at a 5.1% steady growth rate, those events would not affect his ultimate evaluation.

65. Mr. Wilhoite's expert opinion was that a reasonable estimate of the fair market value of [Husband's] BNB and BBI shares as of June 22, 1990 was $9,730,000.

66. Mr. Wilhoite rejected the position that the Brookhollow Assets were worth $1,658,799 as of December 31, 1990. This would reflect a 20-21% rate of growth in value per year before the assets were sold in 2002. A good rate of growth for other banks similarly situated would be 7%. He concluded that a 20-21% rate of growth in value per year was not reasonable. The Court notes this opinion was anchored in the April 2, 2002 value reflected in the Regions Financial Corporation purchase.[6]

67. [Wife] retained John Candon, CPA, ABV, CFF to provide a review opinion of the WMA Evaluation.

68. Mr. Candon testified as an expert in the area of business valuations and accounting.

69. Mr. Candon testified that under SSVS, subsequent events should only be utilized as a caution or as a confirmation, not as the sole basis of valuation.

. . . .

73. According to Mr. Candon, SSVS was clear: subsequent events should NEVER be the sole basis for the valuation - which is what Mr. Wilhoite has done.

74. Therefore, Mr. Candon uniformly rejected Mr. Wilhoite's method of evaluation as not up to professional standards, not credible, not reliable and not relevant. Mr. Candon concluded that Mr. Wilhoite should have ethically refused to complete the appraisal.

75. The Court finds Mr. Candon's critique of Mr. Wilhoite's valuation to be reasonable, credible, and relevant.

76. In evaluating the testimony of both experts, the Court determines that Mr. Wilhoite's explanation, while detailed and thoughtful, is fatally flawed in its treatment and reliance on subsequent events. The professional standard does not allow for the use of valuation data at least twelve (12) years subsequent to the valuation date, to include the April 2, 2002

---

6    The family court's reference is to the "$26.6 million dollar sale [of Husband's bank shares] to Regions Financial Corporation in 2002."

purchase by Regions Financial Corporation of the Brookhollow interests. Furthermore, none of the exceptions or conditions that would allow for the consideration of subsequent data exist. To the extent that it relies on subsequent events, Mr. Wilhoite's valuation is therefore of very limited value.

77. The Court finds that the February 1, 1990 AITD and [Husband's] Statement of Financial Condition for 1990 were credible and reliable sources of information for determining the fair market value of [Husband's] Brookhollow interests on June 22, 1990[.]

. . . .

79. The Court therefore finds, based on the relevant and credible evidence presented at trial, that the fair market value of BBI stock was $14.05 per share on June 22, 1990.

80. The Court also finds, based on the relevant and credible evidence presented at trial, that the fair market value of BNB stock was $14.45 per share on June 22, 1990.

(Cleaned up).

The above findings of fact are not clearly erroneous. We note that the family court, as the trier of fact, "could reject expert testimony in whole or in part." See Ray v. Kapiolani Med. Specialists, 125 Hawaiʻi 253, 263, 259 P.3d 569, 579 (2011). It was within the family court's discretion to weigh the evidence and the credibility of the witnesses, including Candon, Wilhoite, and Husband. The family court found that Wilhoite and Husband's testimony was not credible; it found Candon's testimony to be credible. The family court also found the Agreement Incident to Divorce, signed by Husband and his first wife in January 1990, and Husband's December 1990 Statement of Financial Condition, to be "credible and reliable

8

sources of information for determining the fair market value of [Husband's] Brookhollow interests on June 22, 1990."

On this basis, the family court found that the bank shares were worth a total of $1,683,666.30.[7]  The family court's valuation of Husband's bank shares was reasonable and based upon what the family court found to be the credible record evidence. We conclude that the family court did not abuse its discretion in its valuation of Husband's Category 1 assets.

(2) Husband contends that the family court erred in deviating from the Partnership Model to *sua sponte* award Husband's $1.89 million IRA to Wife, and that "because the court computed her equalization payment with this IRA still awarded to Husband, Wife received both the IRA and 50% of its value[.]"

"The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings." Tougas v. Tougas, 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994).

> In determining whether the circumstances justify deviation from the partnership model, the family court must consider the following:  the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case.

Gordon, 135 Hawai'i at 352-53, 350 P.3d at 1020-21.

---

[7]    This amount represents the family court's valuation of Husband's BNB stock at $54,765.50 (3,790 shares at $14.45 per share), and BBI stock at $1,628,900.80 (115,936 shares at $14.05 per share).

We review the family court's decision as to "whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division" as a question of law, under the right/wrong standard of review. Jackson v. Jackson, 84 Hawaiʻi 319, 332-33, 933 P.2d 1353, 1366-67 (App. 1997). We review the family court's decision as to "whether or not there will be a deviation," and "the extent of the deviation," for abuse of discretion. Id.

The family court entered the following conclusions of law (**COL**),

> E.4. [Wife] is sixty-five (65). She is not reasonably employable and her only income is $1,023.60 [per month] from social security. [Wife] lives in a rental unit. Her monthly expenses are $16,693.98, a deficit of <$15,670.38>. Although [Wife] will receive alimony of $10,200.00 per month, she will only receive this for so long as [Husband] is alive and [Husband] is eighty-four (84) and in poor health. After receipt of alimony, [Wife's] monthly deficit is <$5,470.38>. In order to lower her monthly deficit, [Wife] is charged with using her equalization payment herein to purchase a home and pay off her car loan.

> E.5. [Wife] will also likely have increased needs for care and assistance in the future. [Wife's] ability to provide for her own future care needs, when alimony is no longer applicable, and even with the property she will receive as a result of this divorce, will depend on the amount of care needed and length of time that care is needed. It will also depend upon [Wife's] use of the property she is being awarded herein, and whether she can generate substantial income therefrom.

> E.6. [Husband] is eighty-four (84). Unlike [Wife], [Husband's] health care needs are substantial now, but largely known (present and future) - and are being met with private pay and private care. [Husband] is already fully capable of continuing to manage his investments in a manner that generates income well above his current expenses. He lives in a well-furnished 4 bedroom, 2.5 bath home in Koko Kai

10

> (a quality residential subdivision) with a pool, ocean view, solar and water filtration system. [Husband's] home is mortgage-free. [Husband's] needs are taken care of and he is able to live comfortably. [Husband's] current net gain (income minus expenses) per month is $58,537.00. After monthly alimony of $10,200.00, [Husband] still enjoys a net gain of $48,337.00. [Husband] should continue to enjoy a net gain even after complying with the Court's orders herein, and for the rest of his life.

> E.7. **The totality of the relevant and credible evidence present valid and relevant considerations authorizing a deviation from the Partnership Model under these circumstances.**

> E.8. Based on the totality of the relevant and credible evidence, **it is just and equitable to deviate from the property division awarded in Court's Attachment A and additionally award [Wife] the Wells Fargo Bank IRA account [] in the amount of $1,894,399.00, or an asset of equivalent value if agreed-upon [sic] by the parties.**

> . . . .

> E.11. Pursuant to Attachment A, **[Husband] owes [Wife] an equalization amount of $6,650,092.31. [Husband] shall pay this amount to [Wife], and transfer ownership of the Wells Fargo Bank IRA account** [] to [Wife]. . . .

(Emphasis added) (footnote omitted).

The record reflects that the family court deviated from the Partnership Model, and awarded Husband's IRA to Wife, based on the totality of the relevant and credible evidence of Wife's need. The family court specifically identified Wife's advanced age, lack of employment prospects, limited income (from social security), expenditures, and anticipated future care needs, as the basis for awarding the IRA account to Wife. We conclude, on this record, that the family court was not wrong in

its conclusion that the above facts represent valid considerations justifying deviation from the Partnership Model.[8]

We further conclude that the family court did not err by awarding Wife an equalization payment in the total amount of $6,650,092.31. The record reflects the family court's intention to deviate from the Partnership Model, on the basis of Wife's need, by awarding to Wife either Husband's IRA **or** "an asset of equivalent value if agreed-upon [sic] by the parties." The family court's property division chart appropriately described the IRA as Husband's asset, which the family court instructed should be "transferred" to Wife in addition to the total Equalization Payment of $6,650,092.31. We conclude that the family court did not abuse its discretion in its decision to deviate from the Partnership Model, and with regard to the extent of its deviation.

(3) Husband contends that the family court erred in awarding Wife spousal support during the duration of Husband's lifetime. We review the family court's award of spousal support for abuse of discretion.

---

[8] To the extent that the above COL are mixed questions of law and fact, we find that they are not clearly erroneous. In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) ("A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.") (citation omitted).

"When deciding in a divorce case whether one party must pay periodic support to the other, for how long, and how much, the family court must consider all of the factors enumerated in [Hawaii Revised Statutes] **HRS** § 580-47(a)." Hamilton v. Hamilton, 138 Hawaiʻi 185, 209, 378 P.3d 901, 925 (2016) (cleaned up).

> In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:
>
> (1)   Financial resources of the parties;
>
> (2)   Ability of the party seeking support and maintenance to meet his or her needs independently;
>
> (3)   Duration of the marriage;
>
> (4)   Standard of living established during the marriage;
>
> (5)   Age of the parties;
>
> (6)   Physical and emotional condition of the parties;
>
> (7)   Usual occupation of the parties during the marriage;
>
> (8)   Vocational skills and employability of the party seeking support and maintenance;
>
> (9)   Needs of the parties;
>
> (10)  Custodial and child support responsibilities;
>
> (11)  Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;
>
> (12)  Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and
>
> (13)  Probable duration of the need of the party seeking support and maintenance.

Id.

The family court entered the following COL regarding spousal support,

D.18. HRS § 580-47(a) mandates that the family court consider thirteen specific considerations before awarding spousal support.

    a.    The application of each of these factors to [Wife's] request for alimony is summarized as follows:

    (1)    Financial resources of the parties prior to property division.

        (a)    [Husband's] income from all sources is $92,223.00 a month.

        (b)    [Wife's] income is $1,023.60/month.

        (c)    [Husband] makes $91,199.40 more per month than [Wife].

        (d)    Assets: [Husband] will have received assets of approximately $11 million, compared to [Wife's] assets of approximately $7 million. SEE: Court's Property Division Chart Attachment A, incorporated herein.

    (2)    Ability of the party seeking support and maintenance to meet his or her needs independently.

        (a)    [Wife] is not able to work in any meaningful manner[.]

        (b)    [Wife] will not have the ability to become self-sufficient in the near future.

    (3)    Duration of the marriage.

        (a)    27½ years.

    (4)    Standard of living established during the marriage.

        (a)    The standard of living during the marriage before the 5/23/16 physical separation: [Husband] paid almost all of the expenses, the parties lived in Hawaiʻi Kai and enjoyed a high standard of living including extensive travel, tennis parties, the use of another home in

Portlock, and the purchase of luxury items.

(5) Age of the parties.

    (a) [Wife] is sixty-five (65); [Husband] is eighty-four (84).

(6) Physical and emotional condition of the parties.

    (a) [Wife] is in generally good health but has increasing physical challenges.

    (b) [Husband] is in poor health.

(7) Usual occupation of the parties during the marriage.

    (a) [Wife] has not worked for the past 23 years and has been a stay at home mother and wife.

    (b) [Husband] has not been employed during the majority of the marriage, but manages his finances in such a way as to result in current monthly income of $92,223.00.

(8) Vocational skills and employability of the party seeking support and maintenance.

    (a) [Wife] is not able to work in any meaningful manner.

(9) Needs of the parties.

    (a) At the time of trial, [Husband's] total monthly income was $92,223.00, and his total monthly expenses were <$33,686.00>.

    (b) At the time of trial, [Wife's] total monthly income was $1,023.60, and her total monthly expenses was <[$]16,223.98>.

(10) Custodial and child support responsibilities. N/A

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance.

> (a)  At trial, [Husband] had a monthly savings of approximately $58,537.00, and can therefore afford to pay alimony to [Wife].
>
> (12)  Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made.
>
>> (a)  [Wife] will receive approximately $7 million in assets as a result of property division herein.
>>
>> (b)  The Court concludes that [Wife] will be able to obtain a residence and transportation on par with the standard she enjoyed during the marriage. [Wife] should therefore have no rent or mortgage expenses, and no car payments.
>>
>> (c)  The Court therefore subtracts these amounts from [Wife's] expenses in calculating her need for the purposes of alimony.
>
> (13)  Probable duration of the need of the party seeking support and maintenance.
>
>> (a)  Life time.

D.19. In awarding alimony, the Court specifically finds that, at age sixty-five (65), after assuming the fulltime role of homemaker for almost two and one-half (2½) decades, it is unreasonable and unrealistic to expect [Wife] to re-establish her legal career in a state where she has never practiced law (and has not passed the bar) and earn income consistent with the standard of living established during the course of the parties' almost twenty-eight (28) year marriage.

D.20. There is a lack of sufficient evidence to show that [Husband's] ability to meet his own needs, even those estimated to increase over time, would be affected by an award of lifetime spousal support to [Wife].

D.21. Based on its full consideration of all the relevant statutory factors and the credible evidence received by the Court, the Court concludes that an order requiring [Husband] pay [Wife] $10,200.00 a month as and for spousal support for the remainder of his life, with payments to commence the first month following the Court's decision on the remaining issues in this matter, is just and equitable.

16

> D.22. The award of alimony, tied to [Husband's] lifetime as opposed to [Wife's] lifetime, takes into consideration the entirety of the Court's property division awarded herein.

(Footnote omitted).

To the extent that the family court's conclusions above are mixed findings of fact and conclusions of law, they are not clearly erroneous. The family court properly considered the factors set forth by HRS § 580-47(a) (2018), and the record evidence, in determining that spousal support was warranted. On that basis, the family court concluded that the relative length of the marriage, Wife's advanced age, her lack of employment prospects, and Wife's limited social security income and inability to cover her own expenses, all weigh in favor of spousal support. We determine that the family court did not abuse its discretion in awarding spousal support to Wife for the duration of Husband's lifetime.

(4) Husband contends that the family court abused its discretion in awarding attorney's fees and costs to Wife. "[A]n award of attorney's fees is in the sound discretion of the trial court, limited only by the standard that it be fair and reasonable." Id. (quoting Farias v. Farias, 58 Haw. 227, 233, 566 P.2d 1104, 1109 (1977)).

HRS § 580-47(a) states, in pertinent part,

> Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d), jurisdiction of those matters is reserved under the decree by agreement

17

of both parties or by order of court after finding that good cause exists, **the court may make any further orders as shall appear just and equitable . . . (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties . . . and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce.** In making these further orders, **the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce . . . and all other circumstances of the case.**

(Emphasis added).

The record reflects that the family court considered the factors in HRS § 580-47(a) in determining that an award of attorney's fees to Wife was supported by the circumstances of the case. The family court specifically concluded that "the parties' attorney's fees and costs shall be equalized[,]" such that "[t]he party who incurred more [in attorney's fees between May 1, 2016 through January 4, 2019] will then owe and be required to pay the other party one-half (1/2) of the difference between what each party incurred."[9] Moreover, the family court

---

[9] The family court explained,

249. The Court finds [Wife's] request for equalization to be fair and reasonable based on the following:

a. The number of filings in this matter is voluminous. As of September 18, 2018, five hundred and forty-six (546) documents had been filed in this matter. For this Court to have to review and sort through over two (2) years of litigation documents to determine whether, and to what extent, one party should pay the other party's attorney's fees and costs is both unreasonable and impractical.

(continued . . .)

separately awarded Wife her attorney's fees and costs for Husband's First Motion to Bifurcate, which the family court found "caused unnecessary time and expense."[10] We conclude that

_____

[9](. . .continued)
>    b. There is nothing in the record to suggest that [Wife's] four (4) requests for contributions to her legal expenses in this case were unreasonable. In each of the four (4) orders related to her requests, her payment was not characterized as an advance on property division, the receipt of her payment was not conditioned upon a further showing of good cause, she was not cautioned about her use of the funds, and her use of the payment for her attorney's fees and costs was not limited in any respect.
>
>    c. Each party had the opportunity to request, and in some instances did request, that the other party be responsible for the attorney's fees and costs incurred by the requesting party.
>
>    d. [Husband] has controlled almost all of the marital assets and has been able to pay his attorney's fees and costs without limiting it to a specific amount and without first seeking a Court order. It is not fair or reasonable that either party be allowed to substantially reduce the value of the marital estate to the detriment of the other through unlimited spending on attorney's fees and costs.
>
>    e. By sharing equally in the reduction of the value of the marital estate, neither party will have gained a benefit to the detriment of the other party through his or her expenditure of a greater amount of money for his or her attorney's fees and costs. The value of the marital estate has been reduced by the expenditure of money for attorney's fees and costs, and it is fair and reasonable that each party is charged with one-half (1/2) of that reduction.

[10] The family court found that,
>    251. The Court has carefully reviewed [Wife's] six (6) specific requests for attorney's fees and costs related to identified actions taken by [Husband]. The Court

(continued . . .)

the family court's FOF, upon which its award of attorney's fees and costs were based, were not clearly erroneous. We further conclude that the family court's conclusions of law were not wrong. The family court did not abuse its discretion in granting Wife attorney's fees and costs.

For the foregoing reasons, we affirm the family court's Post-Divorce Judgment Regarding Reserved Issues, and the Court's Findings of Fact and Conclusions of Law.

DATED: Honolulu, Hawai'i, October 9, 2024.

On the briefs:                          /s/ Keith K. Hiraoka
                                            Presiding Judge
Peter Van Name Esser,
for Plaintiff-Appellant.                /s/ Clyde J. Wadsworth
                                            Associate Judge
Charles T. Kleintop,
for Defendant-Appellee.                 /s/ Kimberly T. Guidry
                                            Associate Judge

---

[10](. . .continued)
    addresses only one of the specific requests, and denies the rest.

    . . . .

    264. The Court finds that [Husband's] First Motion to Bifurcate caused unnecessary time and expense on the claimed bases that bifurcation was warranted due to his serious health care challenges, threats to his emotional well-being, and the possibility of death from stress - claims he eventually dropped after <u>not</u> providing court-ordered medical records and information to support his claim.

(Footnote omitted).