Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000991
29-MAR-2019
08:18 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

CAAP-14-0000991
SHARON LAPETER, Plaintiff-Appellee, v.
ALFRED LAPETER, Defendant-Appellee
and
JOY MADEMBA-SY YANAGIDA, Real Party in Interest-Appellant
(FC-D NO. 12-1-0364)

and

CAAP-14-0000992
SHARON LAPETER, Plaintiff-Appellee, v.
ALFRED LAPETER, Defendant-Appellant
(FC-D NO. 12-1-0364)

NOS. CAAP-14-0000991 and CAAP-14-0000992

APPEAL FROM THE FAMILY COURT OF THE SECOND CIRCUIT

MARCH 29, 2019

REIFURTH, PRESIDING JUDGE, CHAN AND HIRAOKA, JJ.

OPINION OF THE COURT BY CHAN, J.

These consolidated appeals arise out of divorce proceedings between Sharon LaPeter (Wife) and Alfred LaPeter (Husband) that involved the division of real property assets acquired during the marriage. Among the parties' significant

assets was Centennial Square shopping center (Centennial) located in Idaho, which Wife and Husband jointly owned through a limited liability company, Centennial Square, LLC (the LLC or Centennial LLC). The Family Court of the Second Circuit (Family Court)[1] entered a Divorce Decree (Decree), and subsequently an Amended Divorce Decree (Amended Decree), that awarded Husband all of the parties' interest in Centennial LLC. Wife filed motions for post-decree relief and the Family Court issued Findings of Fact, Conclusions of Law, and an Order memorializing its rulings on Wife's post-decree motions (Post-Decree FOF/COL/Order).

Husband and Husband's counsel each appealed from the Post-Decree FOF/COL/Order, and we ordered the consolidation of their respective appeals. On appeal, Husband contends that: (1) the Family Court erred in granting Wife's requests for post-decree relief because the Family Court was not permitted to reopen the valuation of Centennial from the date of the conclusion of the evidentiary part of trial (DOCOEPOT or end of trial) and modify the Decree based on evidence of post-trial changes in value; (2) the Family Court abused its discretion in imposing sanctions against Husband because the sanctions were based on an erroneous premise, there was insufficient evidence to support the sanctions, and it failed to notify Husband of the legal basis for the sanctions; and (3) the Family Court abused its discretion in awarding Wife her attorney's fees and costs. On appeal, Husband's counsel contends that the Family Court erred in reopening the DOCOEPOT valuation of Centennial and in concluding that she had engaged in acts of professional misconduct, ruling that she may be jointly and severally liable with Husband for a total of $424,959 in sanctions and fees, and referring her conduct to the Hawaiʻi Office of Disciplinary Counsel (ODC) for investigation.

As explained below, we: (1) affirm the Family Court's reopening and revising of its valuation of Centennial pursuant to

---

[1] The Honorable Barclay E. MacDonald presided over the proceedings relevant to this appeal.

2

Hawai'i Family Court Rules (HFCR) Rule 60(b)(2) based on the post-trial, pre-decree evidence of the agreements to sell Centennial and the LLC; (2) affirm the orders for immediate payment of the $278,387 equalization payment awarded in the Amended Decree and one-half of the Centennial escrow impound account of $63,659.50; (3) reverse the sanctions imposed on Husband's counsel and her referral to ODC; (4) vacate the sanctions imposed on Husband; (5) vacate the award of attorney's fees to Wife; and (6) remand the case for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Pre-Decree Events

Prior to Wife filing for divorce in August 2012, Wife and Husband had been married for 36 years. Both were real estate professionals. During their marriage, they acquired significant real estate assets, including their residence on Maui (Maui Residence) and four shopping centers on the mainland, including Centennial.[2] Centennial was owned by Centennial LLC, which in turn was jointly owned by Wife and Husband. Centennial LLC's primary asset was Centennial, and the LLC was formed for the sole purpose of managing Centennial.

The divorce trial was held on March 21, 22, and 25, 2013. The DOCOEPOT was March 25, 2013. During the trial, the parties presented conflicting evidence regarding the value of Centennial, with Husband's appraiser valuing the property at $3,050,000 and Wife's appraiser valuing the property at $4,400,000.[3] The Family Court also received evidence that the tax assessed value of Centennial was $4,039,675.

On August 22, 2013, after the end of trial but before the Family Court issued the Decree dividing the marital estate,

---

[2] The four shopping centers were the Centennial and the Park Plaza shopping center in Idaho, the Roy West shopping center in Utah, and the Ontario Town Square shopping center in Oregon.

[3] Wife proposed that Centennial be awarded to Husband. Husband was in favor of the Family Court awarding Centennial to him if the court accepted his appraiser's valuation, but argued that Centennial should be awarded to Wife if the Family Court accepted her appraiser's valuation.

3

Husband received an unsolicited offer of $4,400,000 from Teton Village, LLC (Teton) for the purchase of Centennial. Teton was owned by Travis J. Johnson (Johnson) and K. Darby Smith (Smith).

Husband asserted and Wife did not dispute that Teton's offer, if accepted, may have triggered approximately $400,000 in prepayment penalties under a Promissory Note (Note) and Deed of Trust encumbering Centennial.[4] The Deed of Trust and Note contained a due on sale clause and prepayment penalties that imposed restrictions on the sale of Centennial or payment of the Note before its July 1, 2015 maturity date.

On August 26, 2013, Husband submitted a counteroffer to Teton, offering to sell Centennial for $4,500,000, with Teton to assume the existing Note and pay the lender a one percent loan assumption fee. The counteroffer was structured to avoid the prepayment penalties under the Note and Deed of Trust.[5] The counteroffer was contingent on Husband being awarded Centennial in his divorce proceedings, and it provided for a closing date of November 15, 2013. On August 29, 2013, Teton accepted Husband's counteroffer and an agreement (Centennial Agreement) was formed.

B. Divorce Decree

On September 4, 2013, the Family Court issued the Decree and corresponding Findings of Fact and Conclusions of Law (FOF/COL). The Family Court ordered the parties to sell the Maui Residence and split the net proceeds; awarded Roy West Center, LLC, which owned the Roy West shopping center, to Wife; and awarded the Ontario Town Square shopping center, the Parkway Plaza shopping center, and Centennial LLC to Husband. The shopping center assets were awarded to Wife and Husband subject to all indebtedness secured by the assets awarded.

In determining the fair market value of Centennial, the

---

[4] In 2005, Centennial LLC had executed the $4,080,000 Note, which was secured by the Deed of Trust encumbering Centennial, to obtain a loan to purchase Centennial.

[5] The Deed of Trust permitted a one time transfer of Centennial without incurring prepayment penalties upon the assumption of the Note and Deed of Trust by a buyer approved by the lender and the payment of a loan assumption fee of one percent of the Note's outstanding balance.

4

Family Court made numerous findings detailing the conflicting evidence presented on Centennial's valuation by the parties at the divorce trial. The Family Court did not adopt the valuation offered by either Wife or Husband,[6] but instead found that "[b]ased on all of the credible evidence, it is reasonable and just to conclude the fair market value of Centennial Square is the Tax Assessed Value of $4,039,675."

Based on its valuation and distribution of the marital assets and liabilities, the Family Court concluded that Husband would owe Wife a "property division (equalization) payment" of $556,754.00. The Family Court ordered that the equalization payment be made from Husband's share of the proceeds from the sale of the Maui Residence or the net proceeds from the sale of any of the shopping centers awarded to Husband. The Family Court also ordered Husband to pay Wife $150,000 from his share of the proceeds from the sale of the Maui Residence "as and for contribution to Wife's legal fees and costs and for committed waste and as and for equitable deviation."[7]

## C. Amended Divorce Decree

On September 16, 2013, Husband and Wife both filed motions to correct or reconsider the Decree and the corresponding FOF/COL. Among other things, Husband's motion sought to correct a mathematical error in the computation of the equalization payment, namely, the Family Court had awarded the full difference

---

[6] The Family Court found that an accurate appraisal of Centennial by either Wife's or Husband's appraiser "was particularly difficult due to lack of suitable 'comparables', necessitating the consideration of listings and of property sales in other geographical areas and states"; that the income capitalization method used by the appraisers was not convincing; and that the conclusions and deposition testimony of both appraisers were "mutually unpersuasive."

[7] The Family Court's determination that Husband's conduct warranted an equitable deviation and that he had committed waste arose out of Husband's involvement with Sondra Kantor (Kantor), whom Husband described as his girlfriend/significant other. Kantor had recently gone through a divorce, and the gross marital estate of Kantor and her former husband was over $96 million. Husband and Kantor had entered into a Cohabitation Agreement which the Family Court construed as providing evidence that Husband had violated its pretrial financial restraining, financial disclosure, and other orders. The Family Court also found that money Husband spent on Kantor, including expenditures when they traveled together, constituted waste.

($556,754)[8] between the allocations to Husband and Wife instead of one-half of the difference ($278,378) necessary to equalize the allocations. Neither Wife nor Husband challenged the Family Court's valuation of Centennial.

On October 23, 2013, the Family Court issued the Amended Decree and corresponding Amended Findings of Fact and Conclusions of Law (Amended FOF/COL). Among other things, the Family Court corrected the mathematical error in computing the equalization payment owed by Husband and reduced the payment from $556,754 to $278,378. The Family Court also modified the division of shopping center escrow impound accounts[9] to provide that "in the unlikely event a shopping center is sold and the sale closes in 2013," the escrow impound account associated with that shopping center shall be divided equally between Husband and Wife.[10] Neither party appealed from the Amended Decree.

**D. Cancellation of the Centennial Agreement and Entering of the LLC Agreement**

While the parties' motions to correct or reconsider the Decree and the corresponding FOF/COL were still pending, Teton cancelled the Centennial Agreement.[11] On October 9, 2013, Johnson and Husband signed a document terminating the Centennial

---

[8] The actual full difference was $556,75_6_, but the Family Court awarded $556,75_4_.

[9] Escrow impound accounts were accounts reserved for the payment of certain accruing shopping center expenses. Centennial, Roy West shopping center, and Parkway Plaza shopping center had existing escrow impound accounts.

[10] The Decree had previously awarded the escrow impound account associated with a particular shopping center to the party awarded the shopping center.

[11] Johnson, one of Teton's owners, testified in his deposition that within a couple of weeks of the August 29, 2013 signed counteroffer from Husband, he received a loan assumption package from the lender, Wells Fargo. Johnson explained that he immediately decided to cancel the Centennial Agreement because the loan assumption package required him and his business partner, Smith, to "[b]asically divulge every piece of financial information" for the eighteen commercial properties they owned, which they were unwilling to do. Johnson stated that he informed Husband by a phone call or an email that he was not going to complete the loan assumption package.

Agreement and releasing Teton's earnest money deposit to Teton.[12]

With an effective date of October 23, 2013, Husband as seller and Johnson and Smith as buyers entered into an agreement for the purchase of Husband's interest in Centennial LLC (LLC Agreement). The LLC Agreement was signed by the buyers on October 7, 2013 and by Husband on October 8, 2013. The LLC Agreement provided for the transfer of Husband's 100 percent interest in Centennial LLC in two phases -- (1) the transfer of a 9 percent interest to buyers on October 23, 2013 (Effective Date) and (2) the automatic transfer of the remaining 91 percent interest to buyers on the maturity date of the Note[13] or July 31, 2015, whichever came first (Final Transfer Date). The LLC Agreement stated that the purchase price for Centennial LLC was based on a total value of Centennial of $4,500,000 and would be paid as follows: (1) a payment of $948,387.91 to Husband on or before the Effective Date; (2) assumption through the LLC of the obligation to pay the Note in the current amount of $3,541,612.09; (3) release to Husband of the $10,000 earnest money submitted for the Centennial Agreement; and (4) payment to Husband on the Final Transfer Date of amounts held by the lender in the escrow impound account as of the Effective Date (anticipated to be $127,319). Although Husband retained a 91 percent interest in the LLC until the Final Transfer Date, all financial responsibility, both benefit and burden, regarding the LLC's interests were transferred to buyers as of the Effective Date, and Husband's 91 percent interest generally had no voting rights after the Effective Date.

The LLC Agreement explained that the sale of Husband's interests in the LLC was structured to avoid triggering the due on sale provisions and prepayment penalties in the Note and Deed of Trust. The LLC Agreement stated:

---

[12] Husband testified that the buyers notified him sometime around October 1, 2013 that they were not going to go forward on the Centennial Agreement and it took a few days to draw up the document terminating the agreement and releasing the earnest money.

[13] The maturity date of the Note was July 1, 2015.

The *Note* and *Deed of Trust* have extensive restrictions and provisions designed to assure that the *Note* is timely and fully paid, but not prepaid, including due on sale provisions and prepayment penalties. But for these restrictions, [Husband] would at this time sell his entire interest in [Centennial LLC] or directly in [Centennial] to the *Buyers* who have made arrangements to pay the *Note* in full. However, none of the parties want to trigger the prepayment penalties and therefore desire to transition ownership in a manner they believe to be in material compliance with the *Note* and *Deed of Trust*. Therefore, pursuant to this *Agreement*, the complete ownership and control of [Centennial LLC] and [Centennial] shall over time be transferred to the *Buyers* with the full purchase price paid at this time but under terms calculated to be in material compliance with the *Note* and *Deed of Trust*. This *Agreement* shall be interpreted and construed consistent with these objectives.

E.   **Wife's Post-Decree Motions for Relief and the Family Court's Post-Decree FOF/COL/Order**

As of the Family Court's issuance of its Amended Decree and Amended FOF/COL on October 23, 2013, Husband had not disclosed the offer and counteroffer regarding Centennial, the Centennial Agreement, or the LLC Agreement to the Family Court or Wife. Beginning on November 15, 2013, Wife filed a series of motions seeking post-decree relief based on allegations that Husband (and Husband's counsel) had fraudulently concealed the sale of Centennial and the LLC.

On November 15, 2013, Wife filed a motion for post-decree relief which, among other things, alleged that Husband had sold his interest in Centennial and sought enforcement of Husband's obligation under the Amended Decree to make the equalization payment out of the proceeds of the sale. On that same date, Wife filed, and the Family Court granted, an ex parte motion for temporary restraining order (TRO). The TRO restrained Husband from: (1) concealing or failing to disclose to the Family Court or Wife the sale, transfer, or assignment of Centennial or the LLC; (2) structuring or characterizing any transaction regarding Centennial or the LLC in any manner which avoids the equalization payment owed to Wife under the Amended Decree; and (3) transferring, encumbering, or otherwise disposing of any proceeds from the sale or transfer of Centennial or the assets owned by the LLC. On December 20, 2013, the Family Court issued an order striking the TRO, but freezing up to $470,000 in

8

Husband's personal account at US Bank until further order. Based on information she had obtained in discovery regarding transactions involving Centennial and the LLC, Wife filed an amended motion for post-decree relief on December 12, 2013, seeking relief under HFCR Rule 60(b), and a second amended motion for post-decree relief on December 13, 2013. Through these post-decree motions, Wife sought relief that included: (1) reopening the valuation of Centennial and increasing it from $4,039,675 to $4,500,000 pursuant to HFCR Rule 60(b)(2) (newly discovered evidence) and HFCR Rule 60(b)(3) (fraud or other misconduct); (2) reopening the amount of the equalization payment due to Wife and increasing it by $230,162.50 to reflect the increased valuation of Centennial pursuant to HFCR Rules 60(b)(2) and (b)(3); (3) the Family Court's determination that Husband's LLC Agreement constituted a sale of Centennial within the meaning of the Amended Decree that triggered Husband's obligation to make the $278,378 equalization payment and enforcement of Husband's obligation to make such payment; (4) the award to Wife of one-half of the escrow impound account held for Centennial; (5) the imposition of additional sanctions against Husband for his "continuing and flagrant violations of court orders and his fraud upon the [Family] Court and [Wife]"; (6) the imposition of sanctions against Husband's counsel, to the extent it is demonstrated that she participated in or countenanced Husband's misconduct; (7) the disqualification of Husband's counsel from representing Husband if a conflict in their interests is shown; and (8) the award to Wife of her attorney's fees and costs incurred in seeking post-decree relief.

On February 6, 2014, the Family Court held an evidentiary hearing on Wife's motions for post-decree relief. In explaining why he did not disclose the post-trial arrangements to sell Centennial or the LLC before the issuance of the Decree or the Amended Decree, Husband testified that it was his understanding that the DOCOEPOT "was the time when all the evidence was presented, the trial was held, and everybody tried to show what they felt everything was worth. And after that

9

date, no more evidence could be submitted." Husband testified that he did not believe he was under any obligation to disclose to the Family Court the increase or decrease in the value of marital assets after the DOCOEPOT.

Husband further testified that during a phone call with Wife in November or early December 2013, he told Wife that he had not sold Centennial, but had "an agreement on it" and had "asked [his] attorney to turn those documents over to [Wife's] attorney."[14] Husband was not certain when he instructed Husband's counsel to release the documents to Wife's attorney, but noted that he "did see an E-mail that [he] sent [Husband's counsel] on November 20th, instructing her to release the documents on the 25th of November."[15] The record indicates that on December 3, 2013, Husband, through Husband's counsel, emailed to Wife's attorneys the LLC Agreement, which provided for a cash payment to Husband of $948,387.91 on or before October 23, 2013, other documents related to the LLC Agreement, and the Centennial Agreement.[16]

---

[14] The record shows that on November 13, 2013, Wife forwarded to Husband an email she had received on October 29, 2013 from the Assumptions Group at Wells Fargo Commercial Mortgage -- Servicing regarding a "Non-Permitted Transfer Request" on Centennial LLC's loan. Husband responded, "This is when I tried to sell Centennial and the buyer tried to assume the loan and decided he did not want to do that and that sale was cancelled. You can ignore this email."

[15] Husband also testified that in response to a letter dated October 21, 2013 from Wife's attorney to Husband's counsel stating that it appears that Husband has sold Centennial and attaching an invoice from a Centennial tenant stating that the LLC was under new ownership, he "immediately sent all the documents" to Husband's counsel and instructed her to turn them over because he had "nothing to hide[.]" Husband testified that Husband's counsel advised him that he should not turn over the documents because Wife had no right to them, and Husband indicated that he deferred to Husband's counsel's advice.

[16] In its Post-Decree FOF/COL/Order, discussed infra, the Family Court found that "[n]either [Husband] nor [Husband's] counsel provided any disclosures regarding the terms, nature and/or extent of any sale or transfer of Centennial, or any documentation pertaining to any such sale or transfer, until December 18, 2013." (Emphasis added). After the Post-Decree FOF/COL/Order was filed, Husband's counsel filed a motion for reconsideration arguing that this finding and related findings were incorrect because Husband's counsel had emailed documents concerning the LLC Agreement and the Centennial Agreement to Wife's counsel on December 3, 2013. On May 5, 2014, prior to filing her motion for reconsideration, Husband's counsel had withdrawn from representing Husband and therefore filed the reconsideration motion on her own behalf. Husband's counsel attached an email transmittal and

On June 23, 2014, the Family Court ruled on Wife's post-decree motions for relief and filed its Post-Decree FOF/COL/Order. In its Post-Decree FOF/COL/Order, the Family Court: (1) pursuant to HFCR Rule 60(b)(2) and (b)(3), reopened and revised its valuation of Centennial from $4,039,675 to $4,500,000 and awarded Wife an additional equalization payment of $230,162.50 based on its revised valuation of Centennial; (2) ruled that the LLC Agreement constituted a sale of Centennial within the meaning of the Amended Decree, thereby triggering Husband's obligation to make the $278,387 equalization payment required under the Amended Decree, which the Family Court ordered Husband to pay forthwith; (3) ruled that the sale of Centennial closed in 2013 within the meaning of the Amended Decree, thereby triggering Wife's right under the Amended Decree to one-half of Centennial's escrow impound account, or $63,659.50; (4) awarded $300,000 in sanctions against Husband to be paid to Wife, in addition to the $150,000 in sanctions and attorney's fees previously awarded to Wife in the Amended Decree; and (5) awarded $124,959.17 to Wife for attorney's fees she incurred in seeking post-decree relief. The Family Court further ruled that Husband and Husband's counsel would be jointly and severally liable for the $300,000 in additional sanctions and the $124,959.17 in attorney's fees awarded to Wife;[17] referred Husband's counsel to

---

the documents she asserted she had emailed to Wife's counsel, which included the LLC Agreement, wire instructions to Husband's US Bank account, and the Centennial Agreement. In response to Husband's counsel's reconsideration motion, Wife acknowledged that Husband's counsel had emailed these documents on December 3, 2013, but stated that Wife's counsel "had already received the *same* documents from the buyer about 10 days earlier." Wife asserted that Husband and Husband's counsel did not disclose what happened to the $948,387.91 Husband received from the LLC Agreement until Husband's counsel sent Wife's counsel an email on December 18, 2013 containing redacted bank statements of Husband's US Bank account.

[17] The Family Court's ruling on this point states:

Although the Court is unable to determine the precise level and share of misconduct, fraud and concealment attributable to Husband and his counsel, respectively, it may be fair and equitable that Husband and his counsel be jointly and severally liable for the payment of all attorney's fees and sanctions owing to Wife arising from nondisclosure of Husband[']s sale and transfer of Centennial from and after August 22, 2013. The matter of the allocation of their respective liability for such award may

ODC for investigation with respect to whether she violated Hawai'i Rules of Professional Conduct (HRPC) Rule 3.3; and disqualified Husband's counsel from any further representation of Husband.[18]

Husband and Husband's counsel separately appealed from the Post-Decree FOF/COL/Order, and we granted the parties' joint motion to consolidate the appeals.[19]

## II. STANDARDS OF REVIEW

### A. HFCR Rule 60(b) Motions for Relief

The standard of review for the grant or denial of a HFCR Rule 60(b) motion is whether there has been an abuse of discretion. De Mello v. De Mello, 3 Haw. App. 165, 169, 646 P.2d 409, 412 (1982).

> Under the abuse of discretion standard of review, the appellate court is not authorized to disturb the family court's decision unless (1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason.

Wong v. Wong, 87 Hawai'i 475, 486, 960 P.2d 145, 156 (App. 1998) (brackets omitted) (quoting Bennett v. Bennett, 8 Haw. App. 415,

---

be determined by them, or by a court of competent jurisdiction or other satisfactory and fair process.

[18] Of note, Husband's counsel withdrew from representing Husband on May 5, 2014, before the Family Court issued its Post-Decree FOF/COL/Order.

[19] On March 27, 2014, Husband had filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Arizona. Husband subsequently filed a notice that the Bankruptcy Court had filed an order lifting the bankruptcy stay for the limited purpose of permitting Husband to prosecute an appeal from the Post-Decree FOF/COL/Order. This court consolidated Husband's appeal and Husband's counsel's appeal from the Post-Decree FOF/COL/Order in response to a joint motion filed by all parties to consolidate the appeals. Thereafter, because the Post-Decree FOF/COL/Order ruled that Husband and Husband's counsel were jointly and severally liable for sanctions, and because the order lifting the bankruptcy stay to permit Husband's appeal did not address Husband's counsel's appeal, this court asked the parties to address whether there was a bankruptcy stay in effect with respect to Husband's counsel's appeal. In response, Husband submitted a "Stipulated Order Confirming Plan of Reorganization," approved by the Bankruptcy Court on October 7, 2016, which states, in relevant part, that "nothing hereto, should prevent the Hawaii Court of Appeals from proceeding forward with the Debtor's appeal, including any potential action related to [Husband's counsel] and her inclusion in the Reorganized Debtor's Hawaii Court Appeal." Therefore, it appears that there is no bankruptcy stay in effect that would prevent this court from deciding this consolidated appeal.

426, 807 P.2d 597, 603 (1991)).

**B.    Sanctions**

"Regardless of whether sanctions are imposed pursuant to statute, circuit court rule, or the trial court's inherent powers, such awards are reviewed for an abuse of discretion." Kaina v. Gellman, 119 Hawai'i 324, 329, 197 P.3d 776, 781 (App. 2008) (citation omitted).

**C.    Attorney's Fees**

"The trial court's grant or denial of attorney's fees and costs is reviewed under the abuse of discretion standard." Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009) (citations, internal quotation marks, and brackets omitted).

## III.    DISCUSSION

**A.    Revised Valuation of Centennial**

The Family Court reopened and increased the valuation of Centennial and increased the equalization payment owed to Wife pursuant to HFCR Rules 60(b)(2) and (b)(3).[20] The Family Court determined that Husband's post-trial agreements to sell Centennial and the LLC constituted newly discovered evidence which Husband had a duty to disclose and which he fraudulently failed to disclose.

Husband and Husband's counsel argue that the Family Court erred in granting such relief under HFCR 60(b)(2) and

---

[20] HFCR Rules 60(b)(2) and (b)(3) provide:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons:

.  .  .

(2)    newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) of these rules or to reconsider, alter, or amend under Rule 59(e);

(3)    fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party[.]

13

(b)(3) because: (1) the Family Court had no power to reopen the valuation of Centennial based on post-trial evidence; and (2) Husband did not have a duty to disclose the post-trial agreements to sell Centennial and the LLC and thus did not engage in fraud in failing to disclose the agreements.

i.    **The Family Court's Power to Reopen Valuation of Marital Estate Property Based on Post-Trial Evidence**

This case presents the discrete question of whether the Family Court had the power to reopen the valuation of Centennial based on new post-trial, pre-decree evidence.  If the Family Court had no power to reopen the valuation of Centennial based on post-trial evidence, then the requirements for relief under HFCR Rule 60(b)(2) (that the newly discovered evidence must be admissible and would probably have changed the outcome of the proceedings) would not be satisfied.  See Omerod v. Heirs of Kaheananui, 116 Hawai'i 239, 277, 172 P.3d 983, 1021 (2007) (discussing the requirements for Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(2)).  In addition, if the Family Court had no power to reopen the valuation of Centennial based on post-trial evidence, there clearly would be no duty on Husband's part to disclose the post-trial evidence of his agreements to sell Centennial and the LLC and therefore no fraud for failing to disclose such evidence and no relief available under HFCR Rule 60(b)(3).

We begin our analysis by providing an overview of Hawai'i's marital property division scheme.  In Hawai'i, "there is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in [Hawaii Revised Statutes (HRS)] § 580-47."  Tougas v. Tougas, 76 Hawai'i 19, 26, 868 P.2d 437, 444 (1994) (block quote format, brackets, ellipsis points, and citation omitted).  Pursuant to HRS § 580-47,[21] the family court is granted broad discretion to

---

[21] HRS § 580-47(a) (2018) provides in relevant part:

(a) Upon granting a divorce, or thereafter if, in addition
to the powers granted in subsections (c) and (d),
jurisdiction of those matters is reserved under the decree

divide the marital estate according to what is "just and equitable" under the facts and circumstances of each case. Id. at 26, 868 P.2d at 444; Collins v. Wassell, 133 Hawai'i 34, 42, 323 P.3d 1216, 1224 (2014); Kakinami v. Kakinami, 127 Hawai'i 126, 137, 276 P.3d 695, 706 (2012).

The HRS § 580-47(a) directive to the family court to do what is just and equitable under the circumstances requires that each case be decided upon its own facts and circumstances. Tougas, 76 Hawai'i at 26, 868 P.2d at 444. The discretion to divide property of the marital estate based on what is just and equitable "does not mean that the court may do whatever pleases it," but instead means that "the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Id. (block quote format, brackets, ellipsis points, and citation omitted).

In the context of marital property division, the Hawai'i Supreme Court has observed that

> "discretion" denotes the absence of a hard and fast rule. When involved as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.

Id. (block quote format altered; brackets and citation omitted).

In addition to HRS § 580-47, Hawai'i case law has created a framework based on the "partnership model of marriage" to guide the family court in its exercise of discretion in

---

> by agreement of both parties or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable . . . (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate . . . . In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, or violation of a restraining order issued under section 580-10(a) or (b), if any, by either party, and all other circumstances of the case.

dividing property of the marital estate.  Kakinami, 127 Hawai'i at 137, 276 P.3d at 706.  While recognizing that "there is no fixed rule regarding property division other than what is provided in HRS § 580-47," the Hawai'i Supreme Court, pursuant to the partnership model, has endorsed and permitted the use of the following five categories of net market values (NMVs) as guidance in dividing property in divorce cases:

> Category 1.  The . . . (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 2.  The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT . . . .
>
> Category 3.  The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
>
> Category 4.  The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
>
> Category 5.  The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

Id. at 137-38, 276 P.3d at 706-07 (block quote format altered; internal quotation marks, certain brackets, and citations omitted).

> The NMVs in Categories 1 and 3 are the parties' capital contributions to the marital partnership.  The NMVs in Categories 2 and 4 are the during-the-marriage increase in the NMVs of the Categories 1 and 3 properties owned at DOCOEPOT.  Category 5 is the DOCOEPOT NMV in excess of the Categories 1, 2, 3, and 4 NMVs.  In other words, Category 5 is the net profit or loss of the marital partnership after deducting the partners' capital contributions and the during-the-marriage increase in the NMV of property that was a capital contribution to the partnership and is still owned at DOCOEPOT.

Tougas, 76 Hawai'i at 27, 868 P.2d at 445 (quoting Gardner v. Gardner, 8 Haw. App. 461, 467, 810 P.2d 239, 240 (1991)).

Under the partnership-model framework endorsed by Hawai'i case law to divide property of the marital estate, the

16

DOCOEPOT is used in determining the value of property. Here, Husband and Husband's counsel argue that because Hawai'i case law has endorsed a property division framework that ties the valuation of property to the DOCOEPOT, it must be that the family court lacks the power to modify the value of property in the marital estate based on post-trial evidence. Hawai'i case law, however, has not specifically addressed the issue of whether the family court can consider post-trial evidence of valuation that arises before the effective date of a decree granting the divorce and dividing the marital estate.

Although Husband and Husband's counsel's claim is a plausible interpretation of the existing Hawai'i case law, we do not believe it is correct. Instead, viewed in the context of HRS § 580-47, we conclude that the Hawai'i case law establishes a general rule that adopts the DOCOEPOT as the date to use in valuing property in the marital estate, rather than a complete bar to the family court ever considering post-trial, pre-decree evidence of valuation. We further conclude that this general rule is subject to exceptions that permit the family court, in unusual cases, to consider post-trial, pre-decree evidence of valuation when such consideration is necessary to make a just and equitable distribution of the marital estate.[22]

---

[22] There are sound and practical reasons for a general rule which uses the close of the evidentiary part of trial as the date for valuing marital assets, instead of the issuance of the divorce decree that divides the property. The trial is the proceeding at which the family court receives and considers evidence of valuation, and in gathering and marshaling evidence of valuation, the parties need a set time on which to focus. The end of trial provides a concrete date on which the parties can focus their evidence, in contrast to the issuance of the divorce decree, which involves a future date that may be unknown and difficult to predict. The general rule which uses the end of trial as the appropriate day for valuing the marital estate has the benefit of avoiding the uncertainty, the litigation costs, and the administrative expenses of having to update and litigate valuation evidence until the divorce decree is issued. In the typical case, where the divorce decree is issued shortly after the conclusion of trial or where the value of property in the marital estate is relatively stable, the difference between the valuation of the estate at the end of trial and when the divorce decree is issued will not be significant. Given these considerations, we conclude that ordinarily, applying the general rule and valuing the marital estate as of the DOCOEPOT will result in the just and equitable division of the marital estate.

We recognize, however, that there may be exceptional circumstances where application of the general rule will not result in a just and equitable division of the marital estate. For example, where there is a drastic change

Our conclusion is consistent with the language of HRS §
580-47. As noted, HRS § 580-47 grants the family court broad
discretion to divide marital property according to what is "just
and equitable" under the facts and circumstances of each case.
This grant of broad discretion denotes the absence of fixed rules
that would preclude the family court from considering evidence
necessary to make a just and equitable property division. In
addition, HRS § 580-47 authorizes the family court to make orders
dividing the marital estate "[u]pon granting a divorce" and
requires the family court in making such orders to consider
various factors, including "the condition in which each party
will be left by the divorce." These provisions indicate that
events that occur up until the divorce is granted may be
considered when necessary to achieve a just and equitable
property division.[23]

---

in the valuation of a marital asset after trial but before the decree
distributing the asset is issued, the failure to consider post-trial, pre-
decree evidence of valuation may result in an unjust and inequitable
distribution of the marital estate. We conclude that the family court has the
power and discretion, in exceptional cases, to consider post-trial, pre-decree
evidence when necessary to make a just and equitable division of the marital
estate. Cases from other jurisdictions support this conclusion. See Grinaker
v. Grinaker, 553 N.W.2d 204, 208-09 (N.D. 1996) (recognizing that although
"[c]ommon sense dictates that marital property be valued as of the date of
trial, rather than the date of distribution," "relief may be justified in
extraordinary cases when a substantial, unanticipated change in valuation of
an asset occurs after trial but before distribution"); Murphy v. Murphy, 46
A.3d 1093, 1096-99 (D.C. Ct. App. 2012); see also, Brett R. Turner, Equitable
Distribution of Property § 7:5-7:6 (4th ed. 2019) (noting an increasing
willingness of appellate courts to require revaluation of marital property
based on post-trial, pre-decision evidence, particularly in situations where
there was a long delay between the trial and the decision, specific post-trial
events changed the value of marital property, or a significant marital asset
has an unusually volatile value).

[23] In Myers v. Myers, 70 Haw. 143, 153, 764 P.2d 1237, 1243 (1988), the
Hawai'i Supreme Court considered a partnership-model framework for property
division that included a category 6, which, in effect, established "a
presumption that a legal-owner spouse is entitled to the appreciation in
marital assets between the DOFSICOD [(date of final separation in
contemplation of divorce)] and the conclusion of the evidentiary part of the
trial[.]" The supreme court held that this presumption was inconsistent with
HRS § 580-47 and rejected it. In explaining its decision, the supreme court
stated:

> Our divorce and separation laws do "not contemplate any
> final division of property other than where the person is
> divorced a vinculo matrimonii." This is consistent with the
> notion that "marriage is a partnership to which both parties
> bring their financial resources as well as their individual

### ii. Duty to Disclose Post-Trial Evidence of Valuation

We now turn to the question of whether Husband had a duty to disclose the post-trial agreements to sell Centennial and the LLC. The Family Court concluded that Husband had a duty to disclose these agreements and that his failure to disclose the agreements constituted fraud. The Family Court relied on these conclusions in granting Wife relief under HFCR Rule 60(b)(3).

As both Husband and Husband's counsel argue, under the partnership-model framework for property division adopted by Hawai'i case law, the DOCOEPOT has long been identified and used as the appropriate date for valuing the marital estate. See Malek v. Malek, 7 Haw. App. 377, 380-81, 380 n.1, 768 P.2d 243, 246-47, 246 n.1 (1989); Hamilton v. Hamilton, 138 Hawai'i 185, 201, 378 P.3d 901, 917 (2016). As explained above, we have construed the case law as establishing a general rule that the DOCOEPOT is the appropriate date to value the marital estate, but as permitting post-trial evidence of valuation to be considered in exceptional circumstances. We also acknowledged, however, that the case law could plausibly have been interpreted as barring consideration of post-trial evidence. Certainly, there was no Hawai'i case law holding that post-trial evidence of valuation could be considered by the family court or imposing a duty on a party to disclose post-trial evidence of valuation.

Moreover, in this case, there was no discovery or other order requiring Husband to disclose evidence of valuation arising after the divorce trial and before the issuance of the Decree or Amended Decree. In this regard, the parties' stipulated pre-trial order required exchange of account statements "up until the

---

energies and efforts. That one partner brings to the marriage substantially greater resources than the other does not make this any less the case." A presumption that the non-owning spouse is not entitled to any part of the appreciation in property legally owned by the other after a declaration by either that the marriage has ended is inconsistent with the partnership model of marriage we have accepted and the rule that a final division of marital property can be decreed only when the partnership is dissolved.

Id. at 154, 764 P.2d at 1244 (citation and brackets omitted).

trial[.]"  Both the Decree and the Amended Decree contained a provision requiring Husband to make an equalization payment to Wife if Husband sold Centennial, but this provision did not impose a disclosure obligation on Husband.

Under the circumstances of this case, we conclude that Husband had no affirmative duty to disclose the post-trial agreements for the sale of Centennial or the LLC before the entry of the Decree or the Amended Decree.[24]

### iii. Relief Under HFCR Rules 60(b)(2) and (b)(3)

HFCR Rule 60(b)(3) provides relief for "fraud . . . , misrepresentation, or other misconduct of an adverse party." Here, the Family Court determined that Husband had a duty to disclose the post-trial agreements to sell Centennial and the LLC, and that Husband fraudulently failed to disclose such information.  As explained above, we have concluded that Husband had no duty to disclose.  Therefore, the Family Court erred in concluding that Husband's failure to disclose the agreements constituted fraud and abused its discretion in granting Wife relief under HFCR Rule 60(b)(3).

The Family Court may grant relief under HFCR Rule 60(b)(2) for newly discovered evidence

> provided the evidence meets the following requirements: (1) it must be previously undiscovered even though due diligence was exercised; (2) it must be admissible and credible; and (3) it must be of such material and controlling nature as will probably change the outcome and not merely cumulative or ending only to impeach or contradict a witness.

Omerod, 116 Hawai'i at 277, 172 P.3d at 1021 (emphasis and citation omitted) (stating test under HRCP Rule 60(b)).

The record shows that the parties' trial evidence regarding Centennial's valuation was conflicting and included competing appraisals, both of which the Family Court found were unpersuasive and unconvincing, that were $1.35 million apart.  In contrast, the post-trial agreements provided direct, concrete,

---

[24] We note that disclosure duties were imposed only after the issuance of the Amended Decree, when the Family Court issued a TRO which restrained Husband from concealing or failing to disclose to the Family Court or Wife the sale, transfer, or assignment of Centennial or the LLC.

and credible evidence of Centennial's valuation. The post-trial agreements were based on a purchase price or valuation of Centennial of $4,500,000, which was about $460,000 more than the Family Court's valuation in the Decree and Amended Decree. In its Post-Decree FOF/COL/Order, the Family Court found that the "actual sales price of Centennial" agreed to post-trial by Husband "would have been a highly reliable and persuasive fact" for the Court's determination of Centennial's fair market value and that, had it known about the post-trial agreements, it "could and would have" factored in Centennial's actual sales price in calculating the equalization payment owed to Wife.

Given these circumstances, we conclude that although the Family Court erred in granting relief under HFCR Rule 60(b)(3), this error did not affect its decision to grant relief under HFCR Rule 60(b)(2). We further conclude that the post-trial agreements to sell Centennial and the LLC constituted newly discovered evidence and that the Family Court did not abuse its discretion in granting relief under HFCR Rule 60(b)(2). Accordingly, we affirm the Family Court's decision to reopen and increase the valuation of Centennial from $4,039,675 to $4,500,000 based on the post-trial agreements and to increase the equalization payment owed to Wife by $230,162.50 based on its revised valuation of Centennial.

**B. Sanctions Against Husband**

Husband challenges the Family Court's imposition of $300,000 in additional sanctions against him. He argues that the sanctions were based on an erroneous premise, there was insufficient evidence to support the sanctions, and the Family Court failed to notify him of the legal basis for the sanctions.

Hawai'i courts have the inherent power and authority to control the litigation process before them and to impose sanctions for abusive litigation practices. Kaina, 119 Hawai'i at 330, 197 P.3d at 782. However, a trial court must exercise its inherent power to impose sanctions "with restraint and discretion." Bank of Hawaii v. Kunimoto, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999) (citation omitted). A court may not

21

invoke its inherent power to sanction a represented party or an attorney "without a specific finding of bad faith." Id. at 389-90, 984 P.2d at 1215-16; Kaina, 119 Hawai'i at 331, 197 P.3d at 783. Moreover, the court's finding of bad faith must be based on clear and convincing evidence. Kunimoto, 91 Hawai'i at 390-93, 984 P.2d at 1216-19 (applying clear and convincing evidence standard to imposition of sanctions based on finding of bad faith); Tauese v. State, Dep't of Labor & Indus. Relations, 113 Hawai'i 1, 36, 147 P.3d 785, 820 (2006) (noting that the clear and convincing evidence standard is typically used in civil cases involving allegations of fraud or other quasi-criminal wrongdoing to reduce the risk that a party may have his or her reputation tarnished erroneously); Office of Disciplinary Counsel v. Rapp, 70 Haw. 539, 777 P.2d 710 (1989) (utilizing a clear and convincing standard of proof in attorney discipline proceedings). The court's sanction order must inform the person sanctioned of the authority pursuant to which the sanction was imposed. Kaina, 119 Hawai'i at 331, 197 P.3d at 783.

The Family Court's principal basis for imposing sanctions against Husband was its finding that Husband had engaged in fraud and misrepresentation in failing to disclose the post-trial Centennial and LLC Agreements. We have already concluded that under the circumstances of this case, Husband did not have a duty to disclose the post-trial Centennial and LLC Agreements during the period from the DOCOEPOT to the issuance of the Amended Decree on October 23, 2013. Furthermore, it does not appear that the Family Court found that Husband breached a duty to disclose arising out of the TRO issued after the Amended Decree in imposing sanctions against him.[25] Accordingly, we

_____

[25] The TRO was issued on November 15, 2013. The record indicates that on December 3, 2013, approximately two weeks after the TRO was issued, Husband, through Husband's counsel, emailed records pertaining to the sale of the LLC to Wife's counsel. See footnote 16, supra. This included the LLC Agreement showing that a cash payment of $948,387.91 was due to Husband by October 23, 2013. Wife does not dispute that Husband's counsel emailed the records to her counsel on December 3, 2013, but asserts that by this time, she had already obtained the records from the buyers. On December 18, 2013, Husband filed bank records showing his receipt of funds from the LLC Agreement on October 23, 2013. The Family Court found that "but for" the November 15,

22

conclude that the Family Court erred in relying on Husband's purported fraud and misrepresentation in failing to disclose the post-trial agreements in imposing sanctions against him.

The Family Court also appears to have relied upon Husband's purported failure to comply with his obligation to make the equalization payment under the Amended Decree in imposing sanctions against Husband.

We first address whether the LLC Agreement triggered Husband's obligation to make the equalization payment under the Amended Decree. Paragraph 3.O. of the Amended Decree required Husband to make a $276,387 equalization payment to Wife if he "sold" Centennial before the Maui Residence. Paragraph 3.O. provided:

> Property Division Payment. Husband is obligated to make payment as and for property division to Wife from Husband's share of the proceeds from the sale of the [Maui Residence]. If Husband sells one or more of the shopping centers he is awarded before the [Maui Residence] is sold, Husband shall make payment toward his required "marital partnership principle" property division payment to Wife from the net proceeds of the sale of the involved shopping center(s), said payment not to exceed one half of those proceeds.

(Emphasis added.)

Wife argued in the Family Court that Husband's agreement to sell the LLC constituted the "sale" of Centennial within the meaning of the Amended Decree which triggered Husband's obligation to make the $276,387 equalization payment to her. In her post-decree motions for relief, Wife sought immediate enforcement of Husband's obligation to make the equalization payment out of the proceeds of the LLC Agreement. She also argued that Husband's attempt to avoid his payment obligation by concealing the transaction warranted sanctions against Husband.

Husband responded that his agreement to sell the LLC in

---

2013 TRO, Husband would not have disclosed his receipt of the $948,387.91 on October 23, 2013 from the sale of Centennial or made the $278,387 equalization payment to Wife. This indicates that the Family Court believed that the TRO had induced Husband's disclosures and that it did not find that Husband breached a disclosure duty arising out of the TRO.

two phases, 9 percent on October 23, 2013, and the remaining 91 percent in July 2015, did not constitute a sale of Centennial that was concluded in October 2013. Husband argued that the LLC Agreement had been specifically structured to avoid constituting or being characterized as the sale of Centennial on October 23, 2013, so as not to trigger the due on sales clause and a $400,000 prepayment penalty under the Note and Deed of Trust. Husband argued that because the LLC Agreement did not constitute a sale of Centennial on October 23, 2013, and because the transfer in his interest in the LLC would not be completed until July 2015, he was not obligated to make the equalization payment.

The Family Court concluded that, regardless of how the LLC Agreement would be characterized by the lender under the Note and Deed of Trust, the LLC Agreement constituted a sale of Centennial as that term was used and intended by the Family Court in the Amended Decree. The Family Court therefore ordered Husband to make immediate payment of the $278,387 equalization payment owed to Wife under the Amended Decree.

We conclude that the Family Court did not err in construing the LLC Agreement as a sale of Centennial for purposes of the Amended Decree. The Family Court had conditioned Husband's obligation to make the equalization payment on either the sale of the Maui Residence or a shopping center awarded to Husband because Husband lacked the funds necessary to make the equalization payment immediately. Under the LLC Agreement, the buyers were obligated to pay Husband $958,387.91 on or before October 23, 2013. The $958,387.91 was described in the LLC Agreement as "the entire purchase price" and was paid to Husband on or before October 23, 2013.[26] Thus, as of October 23, 2013, through the LLC Agreement, Husband had obtained liquid funds

---

[26] Although the transfer of Husband's remaining 91 percent interest in the LLC would not be completed until July 2015, the LLC Agreement provided that this transfer would be automatic and the parties described the buyers' rights to the remaining interest as "irrevocable." The LLC Agreement also provided that between October 23, 2013 and the transfer of Husband's remaining 91 percent interest in July 2015, the buyers would have all of the financial responsibility, both benefits and burdens, for the LLC.

enabling him to make the equalization payment. The LLC Agreement satisfied the Amended Decree's purpose for conditioning Husband's obligation to make the equalization payment on the sale of Centennial -- to enable Husband to secure funds necessary to make the payment. Therefore, it was reasonable for the Family Court to construe the LLC Agreement as a sale of Centennial effective on October 23, 2013 for purposes of Paragraph 3.O. of the Amended Decree. We conclude that the Family Court did not err in construing the LLC Agreement in this fashion, in concluding that the LLC Agreement triggered Husband's obligation to make the $276,387 equalization payment imposed by the Amended Decree, and in ordering Husband to make immediate payment of this equalization payment.[27]

Because the Family Court's principal basis for imposing sanctions against Husband in the Post-Decree FOF/COL/Order was improper, we vacate the award of sanctions against Husband in the Post-Decree FOF/COL/Order and remand for further proceedings consistent with this opinion. We express no view on whether, absent a disclosure duty, Husband's failure to expeditiously make his equalization payment post-Amended Decree is sufficient to justify the imposition of sanctions. If the Family Court on

---

[27] Although Husband argues on appeal that the Family Court erred in relying on its determination that the sale of Centennial had "closed" in imposing sanctions on him, Husband does not separately challenge the Family Court's order requiring him to make immediate payment of the $276,387 equalization payment. Because Husband does not challenge this order and in light of our analysis, we affirm the Family Court's order requiring Husband to immediately pay the $276,387 equalization payment.

In granting Wife post-decree relief, the Family Court also ordered Husband to immediately pay Wife one half of Centennial's escrow impound account ($63,659.50) existing on October 23, 2013, pursuant to the provision of the Amended Decree requiring the equal division of the escrow impound account in the event "a shopping center is sold and the sale closes in 2013[.]" Husband asserts in his points of error that the Family Court erred in awarding Wife a one-half share of Centennial's escrow impound account, but does not specifically present argument on this point, and he only raises the argument that the sale of Centennial would not close under the LLC Agreement until July 2015 in opposing the imposition of sanctions against him. In any event, given the terms of the LLC Agreement, we conclude that the Family Court did not err in construing the LLC Agreement as the sale of Centennial which closed in 2013 for purposes of the Amended Decree, thereby requiring Husband to split Centennial's escrow impound account with Wife. We therefore affirm the Family Court's order requiring Husband to immediately pay Wife one half of the Centennial escrow impound account.

remand seeks to impose sanctions against Husband arising out of his failure to expeditiously make his equalization payment, it shall make specific findings identifying the basis for imposing sanctions, including the authority pursuant to which sanctions are being imposed, and showing why there is clear and convincing evidence to support the imposition of sanctions.

## C.    Sanctions Against Husband's Counsel

The Family Court sanctioned Husband's counsel by ruling that she was jointly and severally liable with Husband for the $300,000 in sanctions and $124,959.17 in attorney's fees "owing to Wife arising from nondisclosure of Husbands sale and transfer of Centennial from and after August 22, 2013."  In sanctioning Husband's counsel, the Family Court relied upon her alleged complicity with Husband in violating a duty to disclose the post-trial Centennial and LLC Agreements and her purported violation of HRPC Rule 3.3.[28]  Our analysis and conclusion that the Family Court erred in relying on Husband's purported violation of a duty to disclose the post-trial agreements in sanctioning Husband applies equally to Husband's counsel.  We further conclude that

_____

[28] HRPC Rule 3.3, Candor Toward the Tribunal, provides, in part, as follows:

   (a) A lawyer shall not knowingly:

   (1) make a false statement of material fact or law to a tribunal;

   (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

   (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

   (4) offer evidence that the lawyer knows to be false.  If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take remedial measures to the extent reasonably necessary to rectify the consequences.

   (b) The duties stated in paragraphs (a) and (d) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6(a) of these Rules [relating to protection of confidential client information].

26

the Family Court erred in sanctioning Husband's counsel based on her purported violation of HRPC Rule 3.3.

As previously discussed, a trial court cannot invoke its inherent power to impose sanctions against an attorney without a specific finding of bad faith based on clear and convincing evidence. Kunimoto, 91 Hawai'i at 387, 389-90, 984 P.2d at 1213, 1215-16; Kaina, 119 Hawai'i at 331, 197 P.3d at 783. Here, the Family Court relied on speculative inferences drawn from Husband's counsel's "professionalism" and applied a reasonable cause standard in imposing sanctions against her. The Family Court also misapplied HRPC Rule 3.3 in imposing sanctions against Husband's counsel.

In support of its imposition of sanctions against Husband's counsel, the Family Court noted that its "experience with [Husband's counsel] as an attorney over many years is nothing less than highly professional." The Family Court took judicial notice that Husband's counsel,

> in her representation of Husband has been consistently timely and knowledgeable as to Husband's case and position, both as to detail, importance and weight of facts. [Husband's counsel] has further demonstrated the same professionalism as to the knowledge of applicable law. In her representation of Husband, she has been thorough, aggressive, indeed zealous. Therefore, the Court can only conclude that regarding the sale or transfer of Centennial during the period from and after August 22, 2013, there is reasonable cause to believe that Husband's counsel was well aware of the Centennial transactions and has violated [HRPC Rule 3.3].

The record shows that Husband was represented by a law firm from Idaho, and not Husband's counsel, in negotiating the sale of Centennial and the LLC. The Family Court acknowledged that "[i]t is possible" that Husband did not inform Husband's counsel of the sale or transfer of Centennial until after the Family Court issued its TRO on November 15, 2013, but found it "quite unlikely" that she lacked prior knowledge of the post-trial Centennial and LLC Agreements in light of her aggressive actions on behalf of her client. The Family Court concluded that Husband's counsel violated HRPC Rule 3.3 by failing to correct the "false" evidence of Centennial's valuation Husband offered at

27

trial and in citing a Hawai'i case in her pleadings.

There are a number of problems with the Family Court's analysis. First, even assuming *arguendo* that Husband had a duty to disclose the post-trial Centennial and LLC Agreements before the issuance of the TRO (which we have concluded he did not), the Family Court's basis for determining that Husband's counsel had knowledge of the post-trial agreements in time to make a meaningful disclosure, especially before the Decree or Amended Decree, is speculative. The Family Court inferred such knowledge based on Husband's counsel's professionalism and zealous representation of Husband, but those traits are insufficient to support an inference of knowledge in this case.

Second, the Family Court erred in applying a reasonable cause standard of proof, rather than the required clear and convincing evidence standard.

Third, the Family Court misapplied HRPC Rule 3.3 in concluding that Husband's counsel had violated the rule. In its analysis, the Family Court cited HRPC Rule 3.3(a)(4), which provides:

> (a) A lawyer shall not knowingly:
>
> . . .
>
> (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take remedial measures to the extent reasonably necessary to rectify the consequences.

In invoking HRPC Rule 3.3(a)(4), the Family Court apparently reasoned that the appraisal evidence offered by Husband at trial was rendered false by the post-trial agreements to sell Centennial for a higher price. The appraised value of property, however, is an opinion. The opinion evidence regarding Centennial's value contained in the appraisal offered by Husband at trial did not become false by virtue of the post-trial agreements. Moreover, under the existing case law, Husband's counsel had a plausible, good faith argument that the parties' marital estate was to be valued as of the DOCOEPOT and therefore, that post-trial events could not be considered and were not relevant to the Family Court's valuation of Centennial. Under

28

this plausible reading of the case law, the post-trial agreements did not affect the validity of the appraisal evidence Husband presented at trial. See Enos v. Pac. Transfer & Warehouse, Inc., 79 Hawai'i 452, 458, 903 P.2d 1273, 1279 (1995) (indicating that an award of sanctions against an attorney pursuant to a court's inherent power should not be upheld absent "clear evidence that the challenged actions are entirely without color" (quoting United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991))).

The Family Court also concluded that Husband's counsel violated HRPC Rule 3.3 by citing and quoting Cvitanovich-Dubie v. Dubie, 125 Hawai'i 128, 254 P.3d 439 (2011), in arguing that Husband did not commit fraud upon the court that would justify Wife's requests for post-decree relief after the Amended Decree was filed. The Family Court's analysis in support of this conclusion was wrong.

Wife alleged that Husband had committed fraud upon the court in support of her requests for post-decree relief. In response, Husband's counsel filed an opposing brief in which she quoted the following language from Cvitanovich-Dubie:

> This court has noted that, "[s]ince the remedy for fraud on the court is far reaching, it only applies to very unusual cases involving 'far more than an injury to a single litigant[,]' but rather, a 'corruption of the judicial process itself.'" Schefke v. Reliable Collection Agency, Ltd., 96 Hawai'i 408, 431 n. 42, 32 P.3d 52, 75 n. 42 (2001) (citation omitted) (some brackets in original); see also Matsuura v. E.I. Du Pont de Nemours & Co., 102 Hawai'i 149, 171, 73 P.3d 687, 709 (2003) (Acoba, J., concurring and dissenting) ("fraud on the court is not fraud on a party"). It is generally accepted that fraudulent conduct such as perjury or non-disclosure by a party, standing alone, is insufficient to make out a claim for fraud on the court.
>
> . . . .
>
> Not any fraud connected with the presentation of a case amounts to fraud on the court. It must be a "direct assault on the integrity of the judicial process." Courts have required more than nondisclosure by a party or the party's attorney to find fraud on the court. Examples of such fraud include "bribery of a judge," and "the employment of counsel in order to bring an improper influence on the court."

Id. at 144-45, 254 P.3d at 455-56 (format altered; some citations omitted).

29

In Cvitanovich-Dubie, the petitioner sought post-decree relief based on her claims of "fraud on the court" and "undue influence." Id. at 144, 254 P.3d at 455. The Hawai'i Supreme Court: (1) addressed the requirements for a claim of "fraud on the court"; (2) determined that petitioner's allegations did not rise to the level of fraud on the court and therefore were properly evaluated as "fraud . . . , misrepresentation, or other misconduct of an adverse party" under HFCR Rule 60(b)(3); (3) determined that petitioner's undue influence claim also fell within HFCR Rule 60(b)(3); (4) concluded that because petitioner's claims fell within HFCR Rule 60(b)(3), they could not be brought under HFCR Rule 60(b)(6) and were subject to the one-year limitation period for HFCR Rule 60(b)(3), and not the potentially longer "within a reasonable time" limitation period for HFCR Rule 60(b)(6); and (5) held that petitioner's claims were untimely under HFCR Rule 60(b)(3) and therefore properly denied. Id. at 144-50, 254 P.3d 455-61.

It is not clear what provision of HRPC Rule 3.3 the Family Court had in mind in concluding that Husband's counsel's citation of Cvitanovich-Dubie violated HRPC Rule 3.3. The Family Court asserted that Husband's counsel acted improperly in citing Cvitanovich-Dubie because: (1) that case was "decided under Rule 60(b)(6)"; and (2) the supreme court stated in Cvitanovich-Dubie that HFCR Rule 60(b)(3) was inapplicable because petitioner's claims were untimely and "therefor[e] the issue of fraud alleged in that case is only applicable under Rule 60(b)(6)." The Family Court then reasoned that Husband's counsel's citation of Cvitanovich-Dubie appears to have violated HRPC Rule 3.3 because "[Husband's counsel] is only disclosing authority which does not specifically apply to the 60(b)(3) . . . violations that apply in this case."

The Family Court's reasoning is significantly flawed and is based on a misreading of Cvitanovich-Dubie. In Cvitanovich-Dubie, the supreme court specifically addressed the doctrine of "fraud on the court" that Wife had raised in her post-decree requests for relief. Id. at 144-46, 254 P.3d at 455-

30

57. In addition, contrary to the Family Court's assertions, the supreme court in <u>Cvitanovich-Dubie</u> did not decide the case under HFCR Rule 60(b)(6) and did not rule that HFCR Rule 60(b)(3) was inapplicable. <u>Id.</u> Instead, the supreme court decided the case under HFCR Rule 60(b)(3) and held that because petitioner's claims fell within HFCR Rule 60(b)(3), they were barred by the limitation period for HFCR Rule 60(b)(3). <u>Id.</u> The requirements for the doctrine of "fraud on the court" and applicability of HFCR 60(b)(3) were integral to the supreme court's analysis in <u>Cvitanovich-Dubie</u>.

Thus, contrary to the Family Court's underlying premise, <u>Cvitanovich-Dubie</u> provided authority that was directly relevant to Wife's claims of fraud on the court and which addressed the applicability of HFCR Rule 60(b)(3). Husband's counsel accurately quoted <u>Cvitanovich-Dubie</u> and the portions she quoted were a correct statement of the law. We fail to see how Husband's counsel's accurate and direct quotation of language from <u>Cvitanovich-Dubie</u> in her argument, which was a correct statement of law and was responsive to Wife's claims of fraud on the court, could possibly form the basis for the Family Court's conclusion that Husband's counsel violated HRPC Rule 3.3.

Moreover and in any event, attorneys are not limited to only citing case authority that is directly on point, and it is not an ethical violation to cite a case that is not directly applicable. Thus, even if the Family Court were correct that <u>Cvitanovich-Dubie</u> can be distinguished, citing a case that can be distinguished is not a violation of HRPC Rule 3.3.

Based on the foregoing, we conclude that the Family Court's imposition of monetary sanctions against Husband's counsel was based on flawed reasoning and that there was insufficient evidence to support the imposition of monetary sanctions against Husband's counsel. We also conclude that the Family Court did not have a valid basis for referring Husband's counsel to ODC for investigation. We therefore reverse the Family Court's imposition of monetary sanctions against Husband's

31

counsel and its referral of Husband's counsel to ODC.[29]

## D.  Attorney's Fees

Husband challenges the Family Court's award of $124,959.17 in attorney's fees to Wife in connection with her requests for relief after the Amended Decree was filed.  In awarding these fees, it appears that the Family Court was influenced by its erroneous conclusion that Husband had breached a duty to disclose the post-trial agreements.  We therefore vacate the attorney's fees award and remand the case to permit the Family Court to reconsider its award of attorney's fees to Wife in light of our decision.

## IV.  CONCLUSION

Based on the foregoing, we affirm in part, vacate in part, and reverse in part the Family Court's Post-Decree FOF/COL/Order, and we remand the case for further proceedings consistent with this Opinion.


On the briefs:

Calvin E. Young
and Brandon H. Ito
(Ayabe, Chong, Nishimoto, Sia
& Nakamura, LLLP)
for Real Party in Interest-Appellant

Paul A. Tomar
Lynne Jenkins McGivern
Jill M. Hasegawa and
Gemma-Rose Poland Soon
(Ashford & Wriston)
for Plaintiff-Appellee

Rebecca A. Copeland
for Defendant-Appellant

*Lawrence M Reill*

*Derrick H.M. Chan*

*Keith K. Hiraoka*

---

[29] Husband's counsel withdrew from representing Husband before the Family Court issued its Post-Decree FOF/COL/Order, and she did not challenge the Family Court's order disqualifying her from representing Husband on appeal.  We therefore do not address the Family Court's disqualification order.